# EXHIBIT A

## IN THE MATTER OF ARBITRATION

### Between

**AFGE Local 2798,**

**And**                                    **FMCS Case No. 03-01444**
                                           Robert T. Moore

**Department of Veteran Affairs,**
**Washington, DC Medical Center.**

## FINAL  DECISION AND ORDER
## ON ARBITRAL JURISDICTION

**Briefing Arguments**:

For the Grievant (Dr. Hussain):

    Johnnie Landon, Esq                    Local 2798 Counsel

For the Dept. of Veteran Affairs (VA, Agency or Management)

    Karen A. Nappo, Esq.                   VA Office of Regional Counsel

### Issues Presented

1.  Does 5 USC §7121(d) prohibit or limit the arbitration of the present grievances because one or more of the "matters" presented by those grievances was previously raised by the grievant in an earlier Equal Employment Opportunity (EEO) complaint?

2.  Does 5 USC §7121(e)(1), which pertain to Adverse Actions based on conduct and Unacceptable Job Performance, prohibit or limit the arbitration of the present grievances because one or more of the "matters" presented by those grievances were previously raised by the grievant in an earlier Appeal to the Merit System Protection Board?

3.  Does Article 42 of the parties' Labor Agreement bar or limit the arbitration of the present grievances because one or all were not timely filed and/or were not presented by the Union at each step of the negotiated grievance procedure?

4. Do Article 42, Section 2 of the parties' Labor Agreement, coupled with 38 USC §7422, prohibit or limit the arbitration of the present grievances because, by the force and effect of that statute, one or more of the "matters" presented by those grievances cannot be resolved through arbitration?

## Statutes in Issue

**5 USC §7121(d):** An aggrieved employee affected by a prohibited personnel practice under [5 USC] section 2302(b)(1) which also falls under the coverage of the negotiated grievance procedure may raise the matter under a statutory procedure or the negotiated procedure, but not both. An employee shall be deemed to have exercised his option under this subsection to raise the matter under either a statutory procedure or the negotiated procedure at such time as the employee timely initiates an action under the applicable statutory procedure or timely files a grievance in writing, in accordance with the provisions of the parties' negotiated procedure, whichever event occurs first.

**5 USC §2302(a)(1):** For purpose of this title, 'prohibited personnel practice' means any action described in subsection (b).

&ast;     &ast;     &ast;

**5 USC §2302(b):** Any employee who has authority to take, direct others to take, recommend, or approve any personnel action, shall not, with respect to such authority -

**(1):** discriminate for or against any employee [ ] -

> **(A)** on the basis of race, color, religion, sex, or national origin, as prohibited by section 717 of the Civil Rights Act of 1964 (42 USC §2000e-16).

&ast;

**5 USC §7121(e)(1)** Matters covered under sections 4303 and 7512 of the title which also fall within the coverage of the negotiated grievance procedure may, in the discretion of the aggrieved employee, be raised either under the appellate procedures of section 7701 of this title or under the negotiated grievance procedure, but not both. Similar matters which arise under other personnel systems applicable to employees covered by

this chapter may, in the discretion of the aggrieved employee, be raised either under the appellate procedures, if any, applicable to those matters, or under the negotiated grievance procedure, but not both.  An employee shall be deemed to have exercised his option under this subsection to raise a matter either under the applicable appellate procedures or under the negotiated grievance procedure at such time as the employee timely files a notice of appeal under the applicable appellate procedure or timely files a grievance in writing in accordance with the provisions of the parties' negotiated grievance procedure, whichever event occurs first.

**38 USC §7421(a)**   Notwithstanding any law, Executive order, or regulation, the Secretary [of Veterans Affairs] shall prescribe by regulation the hours and conditions of employment and leaves of absence of employees appointed under any provision of the chapter in positions in the Veterans Healthy Administration listed in subsection (b).

**(b)** Subsection (a) refers to the following positions:

    **(1)** Physicians.

*    *

**38 USC §7422(a)** Except as otherwise specifically provided in this title [38] the authority of the Secretary to prescribe regulations under section 7421 of this title is subject to the right of Federal employees to engage in collective bargaining with respect to conditions of employment through representatives chosen by them in accordance with chapter 71 of title 5 (relating to labor-management relations).

**(b)** Such collective bargaining (and any grievance procedures provided under a collective bargaining agreement) in the case of employees described in section 7421(b) of this title [38] may not cover, or have any application to, any matter or question concerning or arising out of

    **(1)** professional conduct or competence,

    **(2)** peer review, or

    **(3)** the establishment, determination, or adjustment of employment compensation under this title [38].

**(c)** For purpose of this section, the term 'professional conduct or compe-

tence' means any of the following:

    **(1)** Direct patient care.

    **(2)** Clinical competence.

**(d)** An issue of whether a matter or question concerns or arises out of

    **(1)** professional conduct or competence,

    **(2)** peer review, or

    **(3)** the establishment, determination, or adjustment of employment compensation under this title [38] shall be decided by the Secretary and is not itself subject to collective bargaining and may not be reviewed by any other agency.

**(e)** A petition for judicial review or petition for enforcement under section 7121 of title 5 in any case involving employees described in section 7421(b) of this title [38] or arising out of the applicability of chapter 71 of title 5 to employees in those positions, shall be taken only in the United States Court of Appeals for the District of Columbia Circuit.

## Collective Bargaining Agreement Provisions in Issue

### Article 42 - Grievance Procedure

**Section 1 - Purpose:**

The purpose of this Article is to provide a mutually acceptable method for prompt and equitable settlement of grievances. This is the exclusive procedure for resolving grievances except as provided in Sections 2 and 3.

**Section 2 - Definitions:**

A. A grievance means any complaint by an employee(s) or the Union concerning any matter relating to employment, any complaint by an employee, the Union, or Management concerning the interpretation or application of this Agreement and any supplements or any claimed violation, misinterpretation or misapplication of law, rule or regulation affecting conditions of employment.

B. This Article shall not govern a grievance concerning

    *  *  *

  2. Retirement

  4. Any examination, certification or appointment

C. Under Title 38 Section 7422, the following exclusions also apply

  1. Any matter or question concerning or arising out of professional conduct or competency such as direct patient care or clinical competence.

  2. Any matter or question concerning or arising out of per review, and/or

  3. Any matter or question concerning or arising out of the establishment, determination, or adjustment of employee compensation under this Title [38].

Note 1: Any question concerning the extent of the exclusions in Paragraphs C1-C3 will be resolved in accordance with the VA Partnership Council's *Guide To Collective Bargaining and Joint Resolution of 38 USC Section 7422 Issues*, which provides that these exclusions will be applied narrowly and only to matters clearly and unequivocally involving direct hands-on patient care or clinical competence.

Note 2: The language in Paragraph C in this Section shall only serve to preclude a grievance where the Secretary, or a lawfully appointed designee of the Secretary (currently the Under-Secretary for Health), determines in accordance with 38 USC [§]7422 that the grievance concerns or arises out of one or more of the three (3) items listed above. Any determination under this language by the Secretary or the Secretary's designee is subject only to judicial review pursuant to 38 USC [§]7422(c).

## Section 4 - Jurisdiction

If either party considers a grievance non-grievable or non-arbitrable, the original grievance will be considered amended to include this issue. The Department must assert any claim of non-grievability or non-arbitrability no later the Step 3 decision.

## Section 7 - Procedure

[ ] In the event of a formal filing of a grievance, the following steps will be followed:

Step 1.  An employee and/;or Union shall present the grievance to the immediate or acting supervisor with an informational copy to the Director of the facility in writing within thirty (30) calendar days of the date that the employee or Union became aware or should have become aware of the act or occurrence or anytime if the act or occurrence is of a continuing nature.  The immediate or acting supervisor will make every effort to resolve the grievance immediately but must meet with the employee/representative and provide a written answer within fourteen (14) calendar days or receipt of the grievance.

Step 2.  If the grievance is not satisfactorily resolved at Step1, it shall be presented to the Service/Division Chief, or equivalent management official or designee, in writing, within seven (7) calendar days of the supervisor's decision.  The grievance must state, in detail, the basis for the grievance and the corrective action desired.  The Service/Division Chief, or equivalent management official, or designee, shall meet with the employee and their representative and provide a written answer within ten (10) calendar days.

Step 3.  If no mutually satisfactory settlement is reached as a result of the second step, the aggrieved party or the Union shall submit the grievance to the Director, or designee, in writing, within seven (7) calendar days of receipt of the [Step 2] decision.  The Director, or designee, will meet with the aggrieved employee and their representative within seven (7) calendar days to discuss the grievance.  The Director or designee will render a written decision to the aggriev ed party and the Union within ten (10) calendar days after the meeting.

Step 4.  If the grievance is not satisfactorily resolved in Step 3, the grie· vance may be referred to arbitration as provided in Article 40 - Arbitration.

### Procedural Posture of the Case

Both the arbitrator's statutory jurisdiction and the more customary matter of Labor Agreement arbitrability have been placed in issue at my prompting when I learn ed that the grievant had filed multiple EEO complaints, a Merit Systems Protection Board (MSPB) appeal, and a Title VII suit in the District Court for the District of Colum bia, all concerning terms and conditions of his VA employment.  These multiple filings suggested the likelihood of jurisdictional problems if any of them involved the same

"matters" or occurrences underpinning the four issues listed by the Union with the FMCS as subjects of this arbitration:

1. Performance Appraisal;
2. Time and Leave;
3. Proficiency; and
4. Constructive Discharge.

Neither party indicated an in-depth understanding that, as a matter of statutory law, the forum in which a "matter" is first raised is the forum which has exclusive juris-diction to determine that matter from start to finish.[1]

Such is the force and effect of both 5 USC §§7121(d) and 7121(e)(1), the com-mon purpose of which was to bar an employee from pursuing a grievance, complaint, or appeal over the same matter or occurrence in more than one forum. There also seemed to be no clear understanding by either side that nothing they, or the forums themselves, can do will change the lack of jurisdiction in the second forum over a matter which either of those statutes establish as the first, and thus sole, forum with jurisdiction.

Besides Title 5 hurdles, further discussions with the parties about the grievant's past employment status with the Agency and the nature of his complaints, suggested another statutory barrier. The Agency claimed that as a VA physician, the grievant is a Title 38 employee, and not just a Title 5 employee. As a result, unless modified by the parties' Labor Agreement, under 38 USC §7422 some of the Union's claimed items in issue here may not be subject to the grievance procedure and arbitration.

By the following letter sent the parties on May 27, 2004, my concerns were ex-plained and they were asked to collect the documents necessary for their resolution:

This is to confirm our recent conversations in which I was informed by each of you that over the course of the past few years, the grievant, Dr. Mohammad Hussain, has filed a number of charges and complaints against the Agency in a variety of forums. These filings may have created issue as to whether I have jurisdiction to hear and decide the whole, part, or no aspect of his grievance.

My jurisdiction exists only if (1) the sovereign immunity of the United

---

[1] Here, "forum" is used to mean the whole of either the EEO complaint process, a MSPB statu-tory appeal steps, or the grievance procedures, starting with the key initiating act of filing either a written EEO complaint, MSPB appeal, or a written grievance.

States has been waived, and, (2) "the limitations and conditions upon which the Government consented to be sued [whether in the courts or before an arbitrator, have been] strictly observed." Lehman v. Nakshian, 453 US 156, 161 (1981). It is this latter requirement of strict observance of procedural requirements that I am worried about, and cannot ignore. Thus, I'm going to put you to work gathering the documents I need to satisfy myself that I have jurisdiction over whatever the subject matters are of Dr. Hussain's grievances.

The Agency will be the principal supplier of the documents I want, since the Union will not necessarily have been involved with, and have copies of, any EEO complaints or MSPB appeals Dr. Hussain has filed. On the other hand, at least in theory, the Agency should have received a copy of every filing Dr. Hussain has made against it. In any event, I charge the Agency with the initial document production responsibility. I want it to provide me with each and every EEO complaint, MSPB appeal, and grievance Dr. Hussain has filed since his employment with the VA began, no matter what it was about. Each complaint, appeal, and grievance should be marked in chronological order, starting with the earliest filing being marked as "Arbitrator's Ex. 1 (or, Arb. Ex. 1,)" and the next as "Arb. Ex. 2."

I also want from the Agency any rulings on Dr. Hussain's filings made by the Agency's EEO Office or officer, the EEOC, the MSPB (where I understand the Board found it had no jurisdiction over one or more of Dr. Hussain's appeals to it), and the court or courts (where I understand Dr. Hussain has a suit against the Agency pending in at least one). If there has been a settlement of any EEO complaint, MSPB appeal, or grievance, each should be included.

Each ruling and settlement should be marked by the Agency in chronological order, starting with the earliest as "Arb. Ex. 21." Where either party's pleadings, including motions, or briefs, addressed the question of the forum's jurisdiction, I want the Agency to provide me with a copy. Each of these series of documents should be marked in chronological order starting with the earliest as "Arb. Ex. 31."

. . . In accordance with the time table I will set below, the Union must respond to the documents provided by the Agency with any additional filings by Dr. Hussain of which it is aware, or becomes aware after reviewing with Dr. Hussain the documents provided by the Agency. I will not look kindly on either party holding back, or not searching out, any document which might affect my determination of jurisdiction.

- 9

\*

With your document submissions, I need an accompanying brief. . In the . . . "legal argument" portion of its brief, the Agency should set out its analysis of the statutes and other binding law applicable to the issue of my jurisdiction, and that of other forums, over the "matter, topic, issue, incident, personnel action, or subject" central to Dr. Hussain's grievances.

\*

In the present case, the statutory terms and conditions which Dr. Hussain must have complied with before I have authority to proceed are set forth in the Civil Service Reform Act of 1978, most of which is found in Chapter 71 of Title 5 of the US Code, but with some provisions scattered elsewhere in the Code. Specifically, the provisions I am concerned with are those which give an employee an option of proceeding either through a collectively bargained grievance procedure to arbitration, or before a statutory body such as the FLRA, MSPB, EEOC, or in a US District Court, but forbids the employee from proceeding to both arbitration and through a statutory procedure over the same "matter, topic, issue, incident, personnel action, or subject."

The statutory provisions which I believe are most relevant to whether I have jurisdiction over one or more of the claims made by Dr. Hussain in his grievance are 5 USC §7121(d), which allows an election between arbitration and the statutory EEO procedures, and §7121(e), which allows an election between arbitration and the MSPB appeal route over Adverse Actions and Unacceptable Job Performances.

\*          \*

During a yet further telephone conversation with the parties, the Agency suggested that customary timeliness issues under the parties' grievance procedure also existed.[2]

_____

[2] An un-excused, untimely grievance will foreclose arbitral jurisdiction. On the other hand, in certain unlikely circumstances, under both §7121(d) and §7121(e)(1), an untimely or otherwise impermissible filing of a complaint in an initial forum can save jurisdiction in the second forum to receive the same matter. This mushrooming of an ordinary timeliness issue into a Title 5 issue can occur because the election between the arbitral and EEO forums under §7121(d) occurs only "at such time as the employee timely initiates an action under the applicable statutory procedure or timely files a grievance in writing." Similar language as to the timeliness of the triggering act which constitutes an election between arbitration and a MSPB appeal is specified in §7121(e)(1).

FMCS Case No. 03-01444

- 10 -     <u>AFGE L.2798 & VA</u>

<u>**Facts**</u>

The issues raised <u>sua sponte</u> by me presented the Union with what is tantamount to a "motion to dismiss." Accordingly, the grievant's allegations contained in his various complaints and his grievances will be treated as "facts." Of course treating these allegations as true for the purpose of deciding jurisdiction will not serve to relieve the Union or Dr. Hussain of their burdens to prove those allegations which are found to be in issue on the merits in this arbitration.

**Background.** The grievant, Mohamed Hussain, is a physician with a specialization in oncology radiology (the treatment of tumors by radiation) who, until his retirement, had worked 27 years for the VA at its Washington, DC Medical Center (DCMC). He describes himself as being a non-white, or dark skinned, Asian-Indian Muslim, born in India on April 15, 1946, a little over a year before the 1947 partitioning of British India into the the natons of India and the Islamic Republic of Pakistan , the later consisting of two parts ( west Pakistan and East Pakistan ( now Bangladesh).

His problems with the VA began sometime before or around September, 2000, when Management of the DCMC undertook a merger of the Imaging Service and the Radiation Therapy Service into a combined Radiology Service. Prior to the merger, Dr. Hussain had served as Acting Chief of the Radiation Therapy Service. The merger's resulting ramifications in personnel assignments, duties and responsibilities, and in the treatment he received thereafter, gave rise to the series of complaints and grievances that have been filed by Dr. Hussain.

Whether arbitral jurisdiction exist over any "matter" that Dr. Hussain has sought more than once to place in issue depends on the sequence of his filings, where they occurred, and what they were about. What follows in chronological order are recaps of Dr. Hussain's filings, identifying the individual "matters" raised, the Agency's responses where grievances were involved, and any other relevant documents.

**1. 02/14/01 Written EEO Complaint** (Arb.Ex.1), complaining that on the basis of race, color, religion, national origin, and age, Dr. Hussain was discriminated against with regard to:

**a.** <u>09/26/00 Merger of Imagining and Radiation Therapy Service</u>

**i.** Appointment of Dr. Barth, a contract physician, as Chief of the new Radiology Service without open competition for the position, thus barring Dr. Hussain's bid and consideration for the position.

**ii**. Thereafter, failing to make Dr. Hussain the permanent Chief of Radiation Oncology within Radiology Service, but instead, continuing to designate him as Acting Chief.

**iii**. Effectively causing Dr. Hussain to suffer a demotion in status (but not alleging a grade or pay reduction).

**b**. 10/15/00 and Ongoing Harassment in Terms and Conditions of Employment, including:

**i**. Hospital Management's failure to communicate directly with Dr. Hussain.

**ii**. Since 07/97, assigning Dr. Hussain to Radiation Service as the Acting Chief, but without filing the second physician position, leaving Dr. Hussain on-call 24/7 and unable to use vacation leave.

**iii**. No oral or written performance appraisal for 3 years.

**iv**. Failure of Management to respond to Dr. Hussain's attorney's request for a meeting about the merger and Dr. Hussain's resulting status.

**c**. Reprisal:

**i**. Dr. Hussain was notified on 01/08/01 that he would be subject to a National Practitioner Data Bank Peer Review Panel, allegedly prompted by the Hospital's settlement of a patient's tort claim.

**ii**. A wider distribution to Hospital staff members of the Peer Review Notice addressed to Dr. Hussain was made than necessary or appropriate.

**iii**. These actions were taken after Dr. Hussain filed an EEO complaint (assumed to have been an informal rather than a formal written complaint since the present complaint is represented by the Agency to be the first written complaint filed by Dr. Hussain).

**2. 06/18/02 and 08/11/02 Written EEO Complaints** (Arb.Ex.3) filed as amendments to Dr. Hussain's 02/14/01 EEO complaint then pending before an EEOC Administrative Judge. They alleged the following additional acts:

**a**. Denial of Dr. Hussain's 03/08/02 request for 4 day, 40 hour schedule while

granting Dr. Manning, a junior physician, a 40 hours/week schedule

**b.** Refusal of Dr. Fletcher to give Dr. Hussian a copy of Dr. Fletcher's negative work performance evaluation for 07/30/00–07/30/01, and refusal of Dr. Barth to give him a copy of his 07/30/01-07/30/02 negative evaluation.

**3. 02/24/03 Amended Title VII Complaint filed in US District Court for DC,**[3] (Arb.Ex. 2), naming as defendants the VA and various members of VA management and Hospital staff members, both in their official capacities and individually, alleging that on the basis of his race, sex, color and national origin (but not religion) Dr Hussain was:

**a.** Not made the permanent Chief of Radiation Oncology, but remained as Acting Chief.

**b.** After seeking the permanent Chief position and filing an EEO complaint, he was subject to a hostile work environment, including having a former subordinate (Dr. Manning) placed in a supervisor role over him.

**c.** Intentionally discriminated against Dr. Hussain by

Denial of meritorious grievances (not identified)

ii. Refusal of Dr. Fletcher to promote Dr. Hussain's appointment as Chief of Radiation Oncology, but instead selected Dr. Manning (female) because he feared Dr. Hussain would be appointed through the resolution of his EEO complaint.

iii. Hostile work environment created by Hospital Director Garfunkel and Drs. Barth, Fletcher, Klemens, Krasnow and Manning because of his race, national origin, religion and age.

iv  Denial of special pay and a compressed work schedule.

v. "Rancorous and hostile" proficiency ratings that were wrongly circulated among the hospital staff to undermine Dr. Hussain's ability to interact with subordinates and medical colleagues.

---

[3] If there was an "original" Title VII Complaint filed, a copy was not included in the Agency's submissions or the Union's. In any event, this Amended Complaint appears to have been dismissed by the court on 09/17/03 for failure to name the proper statutory defendant (attached to Ar.Ex. 10).

vi. Inflecting great emotional stress causing Dr. Hussain to have to obtain expensive treatment for the resulting illness.

**4. 07/09/03 Step 1 Written (clinical privileges) Grievance** (Arb.Ex. 4), alleging violation of Labor Agreement Article 26(6), Performance Appraisal System Process, by:

**a**. On **06/03/03**, Dr. Hussain was notified that his **clinical privileges** were renewed, but with "modifications" noted on the renewal notice requiring Dr. Hussain to document "in the patient's record weekly examination results (symptoms and physical signs), related to the patient's treatment site and the patient's overall condition while on treatment and for follow-up visits," with a further notation that, "modification will be reviewed monthly - current privileges renewed for 3 mos."

**b**. In taking this action, the Agency violated the parties' Labor Agreement in that Dr. Hussain was not "afforded a reasonable opportunity of at least thirty (30) calendar days to resolve the identified performance-related problem(s)," as required by Article 26(6).

**5. 07/14/03 Agency Rejection of 07/09/03 Step 1 Written (clinical privileges) Grievance** (Ar.Ex. 4A) on basis other than timeliness.

**6. 07/22/03 Step 2 Written (clinical privileges) Grievance** (Arb.Ex.5), advancing the 07/09/03 Step 1 allegations to the next grievance procedure level.

**7. 08//18/03 Agency Rejection of 07/22/03 Step 2 Written (clinical privileges) Grievance** (Arb.Ex. 5A) asserting, but without questioning original timeliness of the Step 1 Grievance, that:

**a**. As a Title 38 Physician, Dr. Hussain is not covered by Art. 26(6), Performance Appraisal System Process, but by Art. 54, Proficiency.

**b**. Furthermore, under Labor Agreement Art. 42(2)(C) Grievance Procedure, and 38 USC §7422, excluded from the negotiated grievance procedure are matters or questions concerning (a) professional conduct or competence involving direct patient care or clinical competence, and/or (b) peer review.

**8. 08/22/03 Step 3 Written (clinical privileges) Grievance** (Arb.Ex.5B), advancing the Step 2 grievance to next procedural level.

**9. On 09/08/03, an Agency Response to 08/22/03 Step 3 (clinical privi-**

leges) **Grievance** would have been due under the arbitrator's reading of Art.42(7) (Step3) of the Labor Agreement, but was not filed by this, or on any other later date. For reasons not explained, the Union sets the outside Agency response date as 10/06/03

**10. 09/05/03 Written EEO Complaint** (Arb.Ex. 6), listing "Reprisal & Harassment & Age," as the basis for the acts of:

|     |                                         |                    |          |
| --- | --------------------------------------- | ------------------ | -------- |
| **a.** | Termination threats.                 | Date of Occurrence | 08/2002  |
| **b.** | Denial of leave.                     |                    |          |
| **c.** | Poor Performance Rating.             | Date of Occurrence | 07/28/03 |
| **d.** | Constructive Discharge (retirement)  |                    | 08/14/03 |
| **e.** | Denial of OWCP claim                 |                    | 07/28/03 |
| **f.** | AWOL [Pay status] Placement          |                    | 08/07/03 |
| **g.** | Delaying Retirement Paper Processing |                    | 08/15/93 |

**11. 09/11/03 Step 1 Written (annual proficiency report) Grievance**. (Arb.Ex. 7), alleging:

**a.** On **07/28/03**, Dr. Hussain was summons to Dr. Barth's office to receive a copy of his **annual proficiency report** for period ending 07/30/03. When he was informed of the purpose of the meeting, he asked to have Union representation present, but it was denied in violation of Labor Agreement Article 46(3) - Rights and Responsibilities - Union Representation.

**b.** On **07/28/03**, Dr. Barth gave Dr. Hussain a copy of his annual proficiency report which reflected a "low satisfactory" **proficiency rating**. This rating was allegedly given without first affording Dr. Hussain "a reasonable opportunity of at least thirty (30) calendar days to resolve the identified performance-related problem(s)" as required by Article 26(6) of the Labor Agreement.

**12. 09/15/03 Step 1 Written (AWOL) Grievance** (Arb.Ex. 8), the thrust of which alleged:

**a.** In violation of Article 32 -Time and Leave, Section 5 - Documentation for Sick Leave, Dr. Hussain was placed in AWOL status after his physician had faxed a letter to Management stating the nature of medical reasons why Dr. Hussain

FMCS Case No. 03-01444
- 15 -          <u>AFGE L.2798 & VA</u>

needed to be placed on sick leave and the expected length of his absence.

**13.  10/17/03 Step 2 Written (AWOL) Grievance** (Arb.Ex. 24A), seeking to advance the grievance to the next step, but bearing the notation on the Union copy (the only copy submitted) that, "Management refused to sign for or accept, as 'Dr. Hussain has retired.'"

**14.  11/06/03 Second Amended Title VII Complaint filed in US District Court for DC[4]** (Arb.Ex. 9), naming the Secretary of Veteran Affairs as the defendant and alleging that Dr. Hussain had been discriminated against in violation of Title VII on the basis of his race, sex, color, national origin and religion.  The specific nature of the alleged discrimination were:

   **a.  Failure to Promote** Dr. Hussain to the position of permanent Chief of Radiation Oncology, but continued him only as the Acting Chief.

   **b.  Retaliation** for filing an EEO complaint by:

      i. Demotion when Dr. Manning was made Dr. Hussain's supervisor rather than remaining as Dr. Hussain's assistant.

      ii. Wrongly Subjected Dr. Hussain to a tort claim

      iii. Denial of Special Pay to which Dr. Hussain was entitled.

      iv. Denial of Dr. Hussain's Clinical Privileges.

      v  Scrupulous Monitoring of Dr. Hussain's Care of Patients

      vi. Poor Performance Evaluations.

      vii. Denial of Medical Leave

      viii. Intentional Delay in Forwarding a Supervisor's Letter Needed for Dr. Hussain's Retirement.

---

[4] The 11/06/03 date is selected from the court's docket entry (pacer) sheets in Dr. Hussain's District Court case (part of Arb.Ex. 10).  The copy of the Second Amended Complaint provided by the Agency is, without explanation, undated and unsigned, but I assume it to be the pleading referred to by the court since it provides a signature line for Tony O. Show who, on the same 11/06/03 date, filed a notice of appearance as counsel for Dr. Hussain in substitution for Frederick M. Brandes, whose name had appeared on earlier pleadings.

ix. Denial of Agency Counsel and Advice about Dr. Hussain's Retirement Options and the availability of a Waiver of the Agency's Recovery from Dr Hussain of Special Pay.

x.  Denial of Dr. Hussain's Access to his Official Personnel File

xi. Constructive Discharge; Denial of Special Pay. Quoting the whole of this allegation, it claimed:

> As stated earlier, on Wednesday, September 17, 2003, Dr. Hussain met with James Lebron and Bill Moore to discuss his retirement options. Dr. Hussain was informed by Bill Moore that Director Garfunkel had the authority to waive the portion of the Special Pay contract requiring the paying back of amounts already received by doctors who retire before the end of the term of the Special Pay contract. Special Pay is given to all doctors at the VAMC to make up for the difference in pay that public sector doctors receive compared to private sector doctors. This waiver [if?] given by Director Garfunkel would enable Dr. Hussain to not be required to pay back amounts he received under the current Special Pay contract. Dr. Hussain has always maintained that Director Garfunkel has authority over Special Pay contracts given to doctors at the VAMC. If Director Garfunkel has the authority to waive the Special Pay contract if Dr. Hussain retires, he had that same authority when he decided to deny Dr. Hussain his Special Pay ($23,000) earlier. The [failure] to use that authority in the earlier denial of Special Pay was retaliation for Dr. Hussain filing an EEO claim against the Director.

c. **Hostile Work Environment** in the form of:

i. Job Termination Threats.

ii. Failure to Address the Insubordination of Dr. Hussain's Subordinates

d. **Constructive Discharge**, which in its entirety reads:

Management officials at the VAMC have discriminatorily

created working conditions for Dr. Hussain which are so difficult, hostile, abusive, unpleasant, and intolerable that he feels compelled to resign. These conditions to which we refer are well documented and encompass all of Dr. Hussain's prior EEOC and other claims. They include, but are not limited to:

• Given false reasons for not becoming permanent chief;

• Failure to promote and later demoted;

• Gets unfavorable duty hours/work week (everyone in Department works 4-day workweeks);

• Given inferior compensation package compared to all [other] physicians in [Dr. Hussain's] Department;

   Poor evaluations since filing EEOC action;

• Withholding of Special Pay given to all physicians;

• Subjected to insubordination of staff without management addressing such occurrences;

• Subjected to credentialing every three months instead of every two years;

• Subjected to off the record termination threats and verbal harassment;

• Denied sick leave even when authorized by a physician;

• Was scrupulously monitored;

• Treated in a disparate manner compared to his colleagues, and but not finally,

• Singled out for so-called malpractice, though cleared

The biased and poor ratings Dr. Hussain received, without notice, on his last evaluation dated July 28, 2003 has finally convinced Dr. Hussain that his 27 years of service must come to an end for his own physical, emotional, psychological and spiritual well-being. The stressful environment

over the years has taken its toll on Dr. Hussain's body and mind

**d.** Intentionally discriminated against Dr. Hussain by:

    i. Denial of meritorious grievances (not identified)

    ii. Refusal of Dr. Fletcher to promote Dr. Hussain's appointment as Chief of Radiation Oncology, but instead selected Dr. Manning (female) because he feared Dr. Hussain would be appointed through the resolution of his EEO complaint.

    iii. Hostile work environment created by Garfunkel (Hospital Director) and Drs. Barth, Fletcher, Klemens, Krasnow and Manning because of his race, national origin, religion and age.

    iv Denial of special pay and compressed work schedule.

    v. "Rancorous and hostile" proficiency ratings that were wrongly circulated among the hospital staff to undermine Dr. Hussain's ability to interact with subordinates and medical colleagues.

    vi. Inflecting great emotional stress causing Dr. Hussain to have to obtain expensive treatment for the resulting illness.

**15. 11/07/03 EEO Written Complaint** alleging reprisals for Dr. Hussain's prior EEO complaints or activity in the form of the following taking place or beginning on the dates indicated:

    **a.** Refuse to grant sick leave, AWOL, no pay check since 8/03.     08/03

    **b.** Delay in processing early/disability retirement.     07/17/03

    **c.** Denial of/failure to provide counsel     09/17/03

    **d.** Denial of access to Official Personnel File     09/17/03

    **e.** Offering waiver for early retirement, bu without back pay     09/17/03

    **f.** Complaint to Professional Standards Board     09/17/03

**16. 11/07/03 Memorandum to the Agency's Acting Chief of Labor Relations from the President of Local 2798 Invoking Arbitration** (Arb.Ex.8A) Sep-

tember 9, 2004, the complete text of which stated

> As allowed under Article 40 - Arbitration, Section 1 - Notice to
> Invoke Arbitration, this shall stand as official notice to invoke arbitration in
> the case of bargaining unit employee Mohammed A. Hussain, MD.

**17.  11/12/03 Joint Agency/AFGE Local 2798 Request to FMCS for a
Panel of Arbitrators** (Arb.Ex.11) listing as issues;

    **a.** Performance Appraisal
    **b.** Time and Leave
    **c.** Proficiency
    **d.** Constructive Discharge

**18.  11/19/03 FMCS Response to Request for a Panel of Arbitrators** (Arb.
Ex.11) listing as issues:

    **a.** Performance Appraisal
    **b.** Time and Leave
    **c.** Proficiency

**19.  11/19/03 "Amended" FMCS Response to Request for a Panel of
Arbitrators** (Arb. Ex.11) listing as issues:

    **a.** Performance Appraisal
    **b.** Time and Leave
    **c.** Proficiency
    **d.** Constructive Discharge

**20.  03/08/04 Letter from VA Office of Resolution Management** (Arb.Ex.
28), addressed to Malbert Rich, an attorney evidently representing Dr. Hussain with
regard to his EEO complaints.  The letter bears no signature and appears to be altered
or "patched" so as to redact portions that may have been contained between and after
the second of its two paragraphs.  Those paragraphs stated:

> The purpose of this letter is to advise you of the consolidated,
> partial acceptance of the EEO complaints of discrimination of [Dr.]
> Hussain [ ] filed September 5, 2003 and [ ] November 7, 2003, against
> officials of the VA Medical Center, Washington, DC.  The dates of the
> complainant's initial contact with an EEO counselor are July 28, 2003 and
> October 8, 2003.

[area of redacted materials][5]

We have reviewed the evidence of record and we have deter-
mined that the complainant filed a union grievance on August 18, 2003,
relating to unacceptable performances,[6] and one on September 15, 2003,
in regard to being charged [with an] absence without leave from, on or
about, July 29, 2003. The records show that the complainant filed a
formal EEO complaint on September 5, 2003 (to inclde events of unac-
ceptable performance and leave) and on November 7, 2003 (to include
leave concerns that he previously addressed in his September 15, 2003
complaint). Based on the evidence of record, we have determined that
the complainant elected to pursue these events through the negotiated
grievance procedure. Therefore, the events of leave and unacceptable
performance are **DISMISSED** in accordance with 29 CFR 1614.107(a)(4)
[the EEOC regulation implementing 5 USC §7121(d)] as matters raised
under a negotiated grievance procedure that permits allegations of discri-

---

[5] The Agency has provided an un-redacted copy of the letter (Arb.Ex. 38A) from which it is
found that the text missing from the version submitted by the Union (Arb. Ex. 38) is not relevant to Step
1 timeliness or any other jurisdiction question.

[6] The only action taken on August 18, 2003 which can be accounted for in the chronology
provided above was item **7** listed above, the **08//18/03 Agency Rejection of the 07/22/03 Step 2
Written (clinical privileges) Grievance** (Arb.Ex. 5A), where the asserted basis for the rejection were

1. As a Title 38 Physician, Dr. Hussain is not covered by Art. 26(6), <u>Performance Appraisal
System Process</u>, and,

2.. Under Labor Agreement Art. 42(2)(C), <u>Grievance Procedure</u>, and 38 USC §7422, excluded
from the grievance procedure are matters or questions concerning (a) professional conduct or
competence involving direct patient care or clinical competence, and/or (b) peer review.

Assuming this is the grievance being referred to in the letter, its actual filing date, according to
the evidence of record as reflected by the chronology complied above, was item **4,** the  **07/09/03 Step
1 Written (clinical privileges) Grievance** (Arb.Ex. 4), alleging that:

**a.** On **06/03/03**, Dr. Hussain was notified that his **clinical privileges** were renewed, but with
"modifications" requiring Dr. Hussain to document "in the patient's record weekly examination
results (symptoms and physical signs), related to the patient's treatment site and the patient's
overall condition while on treatment and for follow-up visits."

**b.** In taking this action, the Agency violated the parties' Labor Agreement in that Dr. Hussain
was not "afforded a reasonable opportunity of at least thirty (30) calendar days to resolve the
identified performance-related problem(s)," as required by Article 26(6).

mination.

Ordinarily, none of Dr. Hussain's non-grievance actions initiated after the filing of his third and last grievance on September 15, 2003 (Item 12 above) would be relevant or material to an arbitrator's statutory jurisdiction.  As emphasized already, only if a matter is first raised in an EEO complaint or MSPB appeal <u>filed prior</u> to a grievance over the same matter will the arbitration of that matter be statutorily blocked.[7]  For this reason, Dr. Hussain's appeals to the MSPB filed after September 15, 2003 have not been listed.

However, this is no ordinary case, and so, included in the above chronology are Dr. Hussain's Second Amended District Court Complaint filed on 11/16/03 (Item 14) and his 11/17/03 EEO complaint filed the next day (Item 15).  They are included because they bear on the issue of "Constructive Discharge" which was listed in the FMCS notices and communications as one of the issues to be arbitrated, all of which will be explained in due time.

### Positions of the Parties

**The Agency's Argument**, raised after it was apprized my May 27, 2004 letter of the basic requirements of 5 USC §7121(d) and other possibly applicable statutes, and after it had been forced to assemble the documents in issue, not surprisingly, urge that:

1.  Under §7121(d), Dr. Hussain's previously filed EEO Complaints, and his amended Title VII suit growing out of them, preempted both his 07/09/2003, 09/11/2003, and 09/15/2003 Step 1 Written Grievances (the three grievances),

2.  Under Article 43, §7 of the Labor Agreement, each of Dr. Hussain's three grievance was untimely, having been filed more than 30 calendar days after the event complained of, and if those salvos did not sink all three grievances, then,

3.  Under Article 43, §1(C), and Note 2 thereto, the Agency reserved the right to unleash 38 USC §7422 against any vulnerable matter raised in Dr. Hussain's first two grievances (those of 07/09/2003 and 09/11/2003).

**The Union's Response** to the Agency's arguments are:

---

[7]  That a matter raised for the first time in one of Dr. Hussain's grievances is also later raised in an EEO complaint, an appeal to the MSPB, or by amendment to his Title VII complaint pending before the District Court, are of no consequence here.  The §§ 7121(d) and 7121(e)(1) effects of those latter actions of Dr. Hussain are to be determined by the other forums.

1. While apparently conceding that if an EEO complaint about a "matter" is followed by a Step 1 grievance over the same "matter," ordinarily §7121(d) will deprive an arbitrator of jurisdiction over the grievance, it insists there is a statutory exception. As the Union explained:

> If the Grievant engaged the EEO process prior to engaging the negotiated grievance process, and the matter is the same in each forum, the Arbitrator has warned that his jurisdiction in this case cannot be established under 5 USC §7121(d). Thus, in order for the Arbitrator to have jurisdiction over this case in that instance, there must exist some independent basis on which the Arbitrator's jurisdiction may be predicated, to wit, 5 USC §2171(e)[8].

*

> If it is determined in that instance that the Arbitrator lacks jurisdiction under 5 USC §2171(d), it must then be determined whether the Agency conduct set forth in 5 USC §7511 and/or 5 USC §4303 as such conduct gives rise to the Arbitrator's jurisdiction in the instant case as provided under 5 USC [§7121(e)].

2. Dr. Hussain's grievances were timely filed at Step 1 and processed through the negotiated grievance procedure as far as the Agency would allow before the Agency wrongfully refused to accept their further processing to and through Step 3, and therefor, arbitration has been properly invoked by the Union.

3. The issue of whether Dr. Hussain was constructively discharged is properly before the arbitrator.

## <u>Discussions</u>

### Issues of Statutory Jurisdiction

**5 USC §7121(d).** The Civil Service Reform Act of 1978 created an intricate map of diverging, and sometimes crisscrossing, routes by way of grievances, EEO complaints and MSPB appeals over which employees can seek the protection or vindication of their employment and collectively bargained rights before a number of agencies or by arbitration. In addition, when coupled with other statutory provisions, the Act opens routes to direct judicial determinations of certain statutory claims on their merits, including

---

[8] There is no 5 USC §2171(e). Chapter 21 of Title 5 provides civil service and general "definitions" for words and phrases used throughout the title. It is assumed the Union meant to reference §7121(e), and that section will be substituted throughout where the Union has cited "§2171(e).

- 23 -

claimed violations of Title VII of the Civil Rights Act of 1964, as amended.

As explained to the parties, when, as here, an employee is covered by a negotiated labor agreement with arbitration as a route to protect or vindicate his rights, and the employee files both written grievances and initiates statutory EEO complaints over the same "matters," it is 5 USC §7121(d) which determines which route is open and which are closed off. In so far as relevant here, that statutory provision states:

> An aggrieved employee affected by a prohibited personnel practice under [5 USC] section 2302(b)(1) [which includes EEO allegations and retaliation claims] . . . may raise the matter under a statutory procedure or the negotiated [grievance] procedure, but not both. An employee shall be deemed to have exercised his option under this subsection to raise the matter under either . . . at such time as the employee timely initiates an action under the applicable statutory procedure or timely files a grievance in writing, . . . whichever event occurs first.

The mechanics of §7121(d), and their effects once triggered, were explained in general terms to the parties in my letter of May 27, 2004. There are, however, some aspects of §7121(d) and the overall scheme of the Civil Service Reform Act (the Act) which need further discussion. First off, there is the question of whether any of the grievances filed by Dr. Hussain concerned the same "matters" as previously raised in his EEO complaints.

This can be difficult since what constitutes a "matter" is not always easy to determine. There has emerged a line of judicial rulings which, on first glance, seems to interpret "matter" to mean a broad category of complaints. These judicial rulings began with the perfectly sound decision in Bonner v. MSPB, 781 F.2d 202, 204-05 (Fed. Cir.,1986), where the court was called on to determine the meaning of the word "matter" as used not in §7121(d), but as used in §7121(a). The pertinent provisions of §7121(a) under scrutiny in Bonner state:

> (a)(1) Except as provided in paragraph (2) of this subsection, any collective bargaining agreement shall provide procedures for the settlement of grievances, including questions of arbitrability. Except as provided in subsections (d), (e) and (g) of this section, the [grievance] procedures shall be the exclusive administrative procedures for resolving grievances which fall within its coverage.

> (2) Any collective bargaining agreement may exclude any matter from the application of the grievance procedures which are provided for in the agreement (emphases in both subsections added).

The factual situation the court in <u>Bonner</u> confronted was a bargaining unit member whose agency had undertaken a RIF that caused her "reassignment" which she felt was incorrect. She sought to rectify the error through an appeal to the MSPB. She relied on 5 USC §7701(a), which provides that a federal employee "may submit an appeal to the [MSPB] from any action which is appealable to the [MSPB] under any law, rule, or <u>regulation</u>." 5 CFR §351.901 was, and is, such a regulation and provides, "an employee who has been furloughed for more than 30 days, separated, or demoted by a reduction-in-force action may appeal to the [MSPB]."

The agency had responded with a motion to dismiss based on the argument that the complainant's only recourse was the grievance procedure because RIFs had not been excluded in the labor agreement, pursuant to §7121(a)(2), from the coverage of the agreement's negotiated grievance procedure. Thereafter, the MSPB dismissed the complainant's appeal on the basis of §7121(a)(1 and 2), and she appealed that dismissal to the Court of Appeals for the Federal Circuit, the judicial overseer of the MSPB.

After finding fault with both the agency's argument and the MSPB's reasoning, the court affirmed the dismissal. It concluded on the basis of a review of legislative history and principles of statutory construction, that "matter" referred to the "underlying action." In the case before it, that meant the RIF complained of was the underlying action. Since the labor agreement had not excluded the "matter" of RIFs from the negotiated grievance procedure, a complaint about a "RIF action" and its implementation or effects on a bargaining unit employee could only be pursued through the grievance procedure, and not by an appeal to the MSPB.

This holding was an eminently logical construction of the term "matter" as used in §7121(a)(2) when coupled with §7121(a)(1), as it was intended. The legislative reasoning behind §7121(a)(1) was to make a parties' negotiated grievance procedure the <u>exclusive</u> source of remedies for complaints, except where a "matter," such as would be within the jurisdiction of the MSPB for employees <u>not</u> covered by a collective bargaining agreement, was excluded from the grievance procedure, as the parties were freely allowed to do under §7121(a)(2). The confines of its ruling were set by the <u>Bonner</u> court at 781 F.2d on 205, and are consistent with this logic:

> The significance of our holding is that if a collective bargaining agreement does exclude the underlying action of a RIF, then the RIF action is not a 'matter' covered by a negotiated grievance procedure and the [MSPB] retains its customary appellate jurisdiction over an appeal from that RIF action.

However, despite the court's boxing in the "significance of [its] holding" to the §7121(a) issue before it, arguments soon emerged for applying the court's "underlying

action" definition of "matter" to other subsections of §7121. Perhaps they arose because the court, 781 F2d. at 204, had pronounced that its "first task [would be] to determine the meaning of the term 'matter' as it appears in section 7121," without immediately limiting that task solely to how the term was used in subsection (a)(2) of that section.

This arguable indication of an intent to define "matter" wherever the word cropped up in §7121, was strengthened by a later set of comments by the court found at 781 F2d., 204. In the last sentence of the paragraph preceding that in which it limited the sweep of its "underlying action" interpretation to the issue raised by the facts before it, it stated in the course of its search for the meaning of "matter," that:

> [T]he statute itself, in other subsections of section 7121, uses the term 'matter' to describe the underlying action. E.g., 5 USC §7121(d) . . . (prohibited personnel practice is a 'matter').

To the extent that these statements in Bonner of the court's apparently broad purpose in affixing a meaning to the word "matter," and its observation about §7121(d), imply that the court was construing the term beyond the issue and facts directly before it, and that the term meant the same at every point it appears in all other subsections of 7121, it is respectfully suggested that such an implication was either not intended by the court, or if it was, it must be considered to be dictum.

Certainly the court recognized from its extensive consideration of its legislative history that the Civil Service Reform Act was a patchwork of legislation in the sense that amendments, different proposed versions of sections, and whole substitute bills, came from many different quarters to ultimately be welded into the finished product. See, Senate Report No. 95-969, and NTEU v. FLRA, 774 F.2d 1181, 1186 (DC Cir., 1985). As a distinguished commentator on the Act and its history has observed, "it was [a] product of many compromises and contain[s] many ambiguities that reflect compromises." Broida, [FLRA] Law and Practice, Dewey Publications, Arlington, Va., 1999.

Because of the Act's mixed parentage, it must be concluded that what "matter" means depends on what Congress meant by "matter" each time it choose to use the word. That means the word has to be read in context, and Chapter 71 of 5 USC presents more than a score of different contexts into which the word has been placed. Even a cursory review of those uses should make one wary of substituting "underlying action" in the place of the word "matter" in any other provision of the Act beyond §7121(a)(2), where the court in Bonner determined that an interchange in terms served to better define the word as used in the context of that subsection.

In section 7121, for example, besides its use in subsection 7121(a)(2), the word 'matter" is used in the singular or plural 12 times in four other subsections. And to

further cast doubt on the wisdom of applying a single unified, all embracing meaning, §7121(e)(1) speaks of "similar matters," and §7121(f) refers to "matters similar to." As for the <u>Bonner</u> court's equating the use of the word "matter" with its use in §7121(d), as well as being <u>dictum</u>, when the whole of the operative sentence of §7121(d) is examined, a problem arises in determining what the court meant by its parenthetical observation, and thus the extent to which any force or effect can be given to it. That sentence of §7121(d) provides:

> An aggrieved employee affected by a prohibited personnel practice under section 2302(b)(1) of [5 USC] which also falls under the coverage of the negotiated grievance procedure may raise the matter under a statutory procedure or the negotiated procedure, but not both.

The problem with the observation that "prohibited personnel practice is a 'matter,'" is that it passes over the fact that §2302(b)(1) lists not only race, color, religion, sex and national origin discrimination prohibited by Title VII, but also discrimination on the basis of <u>age</u> (prohibited by the Age Discrimination in Employment Act), <u>sex</u> (prohibited by the Fair Labor Standard Act (beyond Title VII)), <u>handicap</u> (under the Rehabilitation Act (and now, the ADA)), or "<u>marital status</u> or <u>political affiliation</u> as prohibited under any law, rule, or regulation."

In light of the multiple forms of prohibited discrimination covered by §2302(b)(1), it is hard to accept that the <u>Bonner</u> court meant that a grievance filed under a negotiated grievance procedure over an action allegedly taken in violation of one §2302(b)(1) "prohibited personnel practice" would trigger the bar of §7121(d) against any later election by the same employee to pursue an appeal to the MSPB over a wholly different subsequent action allegedly taken on the basis of another of the §2302(b)(1) "prohibited personnel practices."[9] Such a construction of §7121(d) would be inconsistent with its plain language.[10]

---

[9] For example, if accepted here, the court's <u>dictum</u> about §7121(d) would mean that if an employee appealed a disciplinary action to the MSPB and/or EEOC because the action was allegedly tainted by <u>racial</u> discrimination on the part of the proposing or deciding official, at least so long as that MSPB/EEOC appeal or complaint was pending, §7121(d) would forbid the employee from pursuing a grievance over a later, non-disciplinary action, such as a right to overtime allegedly denied by yet a third member of management, but also because of prohibited <u>racial</u> discrimination. A disturbing consequence of such an application of §7121(d) would be that the second "matter" would never reach either forum if the time to amend or supplement the first matter had passed, or the record was closed and the matter under submission, awaiting a MSPB or EEOC decision.

[10] Most compelling of the statute's wording is its use of the singular, "<u>a</u> prohibited personnel practice . . . which also <u>falls</u>," and not the plural, "prohibited personnel practices . . . which <u>fall</u>" under the coverage of the grievance procedure. Had the court in <u>Bonner</u> included an "a" within its parentheses, it would have helped dispel any misunderstanding about its decision. Possibly, the absence of the

27 -

Rather than relying on <u>Bonner</u>, I find it more prudent to look to <u>Facha</u> v. <u>Cisneros</u>, 914 F.Supp. 1142 (E.D.Pa. 1996) in search of the meaning of "matter" and whether any of Dr. Hussain's grievances are trumped under §7121(d) because of a prior EEO complaint.

<u>Facha</u> distanced itself from any of the extreme readings of <u>Bonner</u>. Although it cites <u>Bonner</u> and quotes its "matter-means-underlying-action" pronouncement, <u>Facha</u> recognized the same question I worry about here:

> We have had considerable difficulty determining the 'matter' [ ] placed in issue here. . . Too narrow a definition of 'matter' would frustrate the election provision of §7121(d). This in turn would undermine the [Civil Service Reform Act]'s reliance on collective bargaining agreements, since clever drafting could then allow an employee to proceed both in a grievance and in an EEO complaint. Too broad a definition of 'matter' would create a trap for the unwary grievant.

The <u>Facha</u> court then proceeded to employ a common sense application of §7121(d) to what it had before it. That was a Complaint in which the plaintiff alleged (1) reprisal for union activity, (2) sex discrimination, and (3) retaliation for prior EEO activity. The jurisdictional problem arose because the plaintiff had filed a grievance <u>prior</u> to her resort to the statutory appeal route leading to the EEOC and the District Court. As in the present case with Dr. Hussain's EEO complaints and his grievances, there were overlaps and duplications of allegations between Ms. Facha's two filings.

In untangling the allegations and determining which of them §7121(d) placed for resolution in the grievance procedure, and which could proceed under Ms. Facha's later election of the EEO statutory route to resolution, the court early on declared:

> [T]he inquiry into whether a federal employee has impermissibly attempted to proceed in two fora must focus on the 'matter' the employee raised (and the forum in which she first raised that matter), not on legal jargon.

That is, the legal theory employed to characterize an incident as an EEO action, a ULP, or simply a violation of the parties' labor agreement, does not determine what constitutes a "matter." Rather, that is determined by whether the allegation in the second filing is talking about the same factual subject or incident. As the <u>Facha</u> court explained:

> To resolve this issue we have relied on practical necessity  We have laid

---

"a" is only a court typo

Facha's grievance side by side with her EEO complaint and have com-
pared the two documents. Our inquiry is straightforward: If Facha raised a
topic in both documents, or if the arbitrator assigned to handle the griev-
ance would necessarily have needed to inquire into a topic in discharging
their duties, then §7121(d) bars her from raising that same topic in her
subsequent EEO complaint.

In the present case, I employ the process followed in <u>Facha</u>. Of course, my focus
is not on a prior grievance and its effect on a later EEO complaint, but vice versa. The
concern is whether Dr. Hussain's prior EEO complaints bar any of his subsequently filed
grievances because a "topic" was first raised in one of the former and later in one of the
latter, or would have to be inquired into on its merits in order to resolve the grievance.

**The Impact of §7121(d) on Dr. Hussain's Step 1 Written Grievance filed
on July 9, 2003**. Dr. Hussain's first grievance complained that:

   **a.** On **06/03/03**, Dr. Hussain was notified that his **clinical privileges** were
renewed, but with "modifications" requiring Dr. Hussain to document "in the
patient's record weekly examination results (symptoms and physical signs),
related to the patient's treatment site and the patient's overall condition while on
treatment and for follow-up visits."

   **b.** In taking this action, the Agency violated the parties' Labor Agreement in that
Dr. Hussain was not "afforded a reasonable opportunity of at least thirty (30)
calendar days to resolve the identified performance-related problem(s)," as
required by Article 26(6) - Performance Appraisal System.

The "topic" of this grievance is straight forward. When Dr. Hussain's clinical
privileges were renewed, they were encumbered with "modifications" that required that
after examining a patient under his treatment, the patient's" symptoms and physical
signs," and "overall condition," be noted in the patient's record. The alleged Labor
Agreement violation was that the modifications were imposed in violation of Article
26(6).

Prior to the July 9, 2003 date of this grievance, Dr. Hussain had filed three written
EEO complaints (02/14/01, 04/19/02, 07/22/02) and his Title VII suit in District Court
(02/24/03). None included the topic of the modifications placed on his clinical privileges
without his being provided a 30 day correction opportunity), but rather concerned the
following topics:

   **1.** The <u>09/26/00 Merger of Imagining and Radiation Therapy Services,</u>
with the sub-topics of:

**i.** Appointment of Dr. Barth as Chief of the new Radiology Services without open competition for the position, barring Dr. Hussain's bid and consideration for the position.

**ii.** Failing to make Dr. Hussain the permanent Chief of Radiation Oncology within Radiology Service instead of Acting Chief.

**iii.** Effectively causing Dr. Hussain to suffer a demotion in status (but not alleging a grade or pay reduction).

**2.** Harassment in Terms and Conditions of Employment, including:

**i.** Hospital Management's failure to communicate directly with Dr. Hussain.

**ii.** Assigning Dr. Hussain to Radiation Service as the Acting Chief, but without filing the second physician position, leaving Dr. Hussain on-call 24/7 and unable to use vacation leave.

**iii.** No oral or written performance appraisal for 3 years.

**iv.** Failure to respond to Dr. Hussain's attorney's request for meeting about merger and Dr. Hussain's resulting status.

**3.** Reprisals for filing an unspecified or otherwise identified EEO complaint, including:

**i.** Notification on 01/08/01 that Dr. Hussain would be subject to a National Practitioner Data Bank Peer Review Panel, allegedly prompted by the Hospital's settlement of a patient's tort claim.

**ii.** A wider distribution among the Hospital Staff of Dr. Hussain's Peer Review notice than necessary or appropriate.

**4.** Denial of a 4 day, 40 hour workweek schedule.

**5.** Refusal to provide a copy of Dr. Fletcher's negative work performance evaluation for 07/30/00–07/30/01, and of Dr. Barth's 07/30/01-07/30/02 negative evaluation.

**6.** After seeking the permanent Oncology Radiation Chief position and filing an

EEO complaint, subject to a hostile work environment, including having a former subordinate (Dr. Manning) placed in a supervisor's role over him.

**7.** Intentional discriminated against Dr. Hussain by:

    **i.** Denial of meritorious grievances (not identified)

    **ii.** Refusal of Dr. Fletcher to promote Dr. Hussain to Chief of Radiation Oncology, but instead selected Dr. Manning (female) because he feared Dr. Hussain would be appointed through the resolution of his EEO complaint.

    **iii.** Hostile work environment created by Garfunkel (Hospital Director) and Drs. Barth, Fletcher, Klemens, Krasnow and Manning because of his race, national origin, religion and age.

    **iv.** Denial of special pay and compressed work schedule

    **v.** "Rancorous and hostile" proficiency ratings that were wrongly circulated among the hospital staff to undermine Dr. Hussain's ability to interact with subordinates and medical colleagues.

    **vi.** Inflecting great emotional stress causing Dr. Hussain to have to obtain expensive treatment for the resulting illness.

It could be argued that of the above topics and sub-topics, items 3(i), 5, and 7(v), because they concerned Management's alleged wrongful or unfair perceptions of Dr. Hussain's professional competency, were the same topics as that of his July 9, 2003 grievance involving placing modifications on the renewal of his clinical privileges, except for one thing. The last of Dr. Hussain's non-grievance filings undertaken prior to his filing his grievance (his Amended Complaint in District Court) was filed on February 24, 2003, more than four months before the June 3, 2003 date on which Dr. Hussain alleged in his grievance that he was informed of the "modifications."

If this made no difference because the Bonner "matter-means-underlying-action" dictum must be read to mean the underlying-action was the questioning of Dr. Hussain's professional competency, then such a "too broad a definition of 'matter' would [have] create[d] a trap for the unwary grievant."   For Dr. Hussain, he would be "trapped" into pursing his claim through the EEO process where he would have the more difficult burden of proving that the modifications would not have been imposed but for his race, color, sex, national origin, or religion. In contrast, he would have the relatively easier burden in the grievance procedure of demonstrating that, somehow or another, the

modifications to his clinical privileges were covered by Article 26(6) of the Labor Agreement which entitled him to the 30 day corrective period.

The MSPB and the EEOC would reject out of hand springing such a trap.  According to both, a §7121(d) forum election cannot occur before the occurrence of a grievable event because, until then, the employee cannot clearly be making an election over the forum in which to contest that event. Sylvester v. VA, 34 MSPB 215, 216 (1987) ("No election under §7121(d) or (e) [barring MSPB-jurisdiction] can occur before the effective date of the appealable action"); Riddick v. OPM, 27 MSPB 590 (1985) ("In as much as no appeal to [the MSPB] may be filed until the effective date of appealable action, an appellant has no option other than the negotiated grievance system prior to that date, and thus can make no election [ ] until that time). Tomei v. DoD, DCMA, EEOC Appeal No. 02A20011 (2002) (an earlier EEO harassment complaint could not bar a grievance over a removal that occurred subsequent to the events embraced in the complaint).

In any event, the parsing out in this arbitration of the "topic" of the "modifications" to the clinical privileges of Dr. Hussain is consistent with the parsing by the Facha court where, for example, it held on the subject of "Hostile Work Environment:"

> Paragraph 21 of Facha's EEO complaint describes two incidents in which Facha's superiors allegedly made derogatory comments to two female office workers regarding their sex. Paragraphs 22 and 23 describe comments disparaging Facha's work performance, but these comments are not explicitly sexual in nature. The arbitrator assigned to resolve Facha's grievance would have no need to verify whether the explicitly sex based comments occurred. [The arbitrator] would, however, need to determine the truth of the comments concerning Facha's work performance. Thus, the grievance bars the latter comment [from consideration in the court litigation], but not the former.

The Facha court has not been alone in limiting the sweep of Bonner. In Dept. of the Treasury, IRS, Oxon Hill, MD and NTEU, Chapter 65, 56 FLRA 292, 296 (2000), (Oxen Hill) the Authority, even though citing Bonner, provided another narrow reading of "matter."

> The term 'matter' as used in section 7121(d) refers 'not to the issue or claim of prohibited discrimination, but, rather, to the personnel action

involved

Besides its Oxen Hill approach to §7121(d), the Authority has been consistent in its holdings on the analytical approach to be taken by it, and thus required of arbitrators, in passing on whether under §7116(d), the same "issue" raised in a ULP charge has subsequently been raised in a grievance, or vice versa. DoD, Marine Corps Logistical Base Albany, Georgia and AFGE Local 2317, 37 FLRA 1268, 1270 (1990), summed up that approach and its fact-based dependancy:

> In determining whether the grievance and the ULP charge involve the same issue, the Authority will look at whether the ULP charge and the grievance arose out of the same set of factual circumstances and whether the theories advanced in support of the ULP charge and the grievance are substantially similar (emphasis added).

In short, whether viewing the nature of a "matter" under §7121(d) or an "issue" under §7116(d), the Authority has consistently looked to the facts of the event in determining whether what is complained about in one filing is the same as that complained about in an earlier filing, no matter if they are of the same genre.

My review of MSPB cases involving §7121(d) found none that directly define "matter." However, besides the Board cases cited above, in others such as Rodriguez v. Department of Justice, DA-0752-01-0211-1-2 (Oct. 18, 2002), involving questions over the chronological order in which an EEO complaint and a grievance were "filed," the "matter" involved has been treated as the specific personnel action or event, such as an actual or proposed removal, without regard to the difference between a charge that prohibited race or sex discrimination infused one, while a lack of "just cause" underlay the other, with the implication that separate actions or events make for separate matters, even if the identical "legal jargon" is used to surround both.

Also reflective of the MSPB's interpretation of the word "matter" is the treatment it gave to an attempted appeal made by Dr. Hussain to the MSPB (Arb.Ex. 12). That appeal is not included in the chronology given above because the attempt was made after Dr. Hussain's third and last Step 1 written grievance was filed. Thus, it can raise neither a §7121(d) nor a §7121(e)(1) bar to arbitral jurisdiction.

---

[11] Of course, exploring whether the modifications placed on Dr. Hussain's clinical privileges amounted to a "personnel action," in a technical or statutory sense, or as an §2302(b) actionable antecedents to a personnel action, would open a whole n'other can of worms. Luckily, that can be avoided since the sole question in arbitration would be whether the imposition of the "modifications" without a prior 30 day correction period violated Article 26(6) of the parties' Labor Agreement.

The appeal is also a bit of a mystery. Neither party submitted a copy of what it was that Dr. Hussain filed with the MSPB. This makes it impossible to independently determine whether he was attempting to file §2302(b)(1) "prohibited personnel prac- tice" appeals, or §4303 "unacceptable job performance" appeals, or some of one and some of the other. In any event, the Agency has submitted a copy of the MSPB's notice to Dr. Hussain telling him that his attempted filing was being returned for failure to meet procedural requirements of the Board. As explained in the Board's December 31, 2003 letter to Dr. Hussain:

> We have received your appeal filed on <u>December 23, 2003</u>. We are returning it to you because it does not meet our filing requirements, for the following reasons:
>
> > You appear to indicate multiple actions from which you attempt to appeal. In Box 13 of the submitted MSPB Form 185, Page 4, you indicated agency actions of:
>
> > a reduction in pay or grade
>
> > 2. a separation, demotion, or furlough of more than 30 days by reduction in-force (RIF), and
>
> > 3. a failure to restore/re-employ/reinstate[
>
> > You further indicate in your submission that you were not promoted to a position for which you feel you were entitled and indicate an OSC [Office of Special Counsel] filing on September 30, 2003, regarding that matter.
>
> > Additionally, in Box 23, Part 3, of MSPB Form 185 you indicate that you are retired and have filed a request to withdraw your retirement applica· tion from OPM.
>
> > Each of these actions, if appealed, <u>must be appealed individually</u>    (both emphases in the original)[12]

---

[12] It appears from a MSPB order issued on 02/26/04 (Arb.Ex. 26), that Dr. Hussain responded to this advice by filing a separate appeal on 01/08/04, alleging that his October 1, 2003 retirement from the VA was not voluntary, but constituted a constructive discharged forced on him by a hostile work envi- ronment and other injustices. Without noting Dr. Hussain's attempt to raise his alleged "constructive discharge" as an issue in this arbitration by asking the FMCS on 11/12/03 to so list it as such, the Board skipped over any 5 USC §7121(e)(1) issue, and went directly to a more basic jurisdictional matter. It found that Dr. Hussain was undisputably employed with the VA pursuant to an "excepted" (non- competitive) appointment under 38 USC §7401(1), and thus was not an "employee" as defined by 5 USC

•

In short, the letter from the MSPB, while not conclusive, indicates that the Board treats each "action" as a separate matter which, under either §7121(d) or §7121(e)(1), could be processed either as a grievance or by an appeal to the Board without raising jurisdictional conflicts as between them.

These fact-based approaches of the FLRA, EEOC and MSPB are consistent with that taken in <u>Facha</u> to determine whether the same "matter" has been raised both in an EEO complaint and a grievance. Together, they seem a sounder way (more consistent with what on the whole the legislative history of the Act suggests Congress intended) of viewing the meaning of "matter" as used in §7121(d) than do readings of <u>Bonner</u> dictum to mean broad categories, such as all prohibited personnel practices.

**The Impact of §7121(d) on Dr. Hussain's Step 1 Written Grievance filed on September 11, 2003**. This second grievance complained that:

**a.** On **07/28/03**, after being summons to Dr. Barth's office to receive a copy of his **proficiency report**, Dr. Hussain was denied the right to have Union representation present in violation of Labor Agreement Article 46(3) - Rights and Responsibilities - Union Representation.

**b.** On **07/28/03**, Dr. Barth gave Dr. Hussain "low satisfactory" **proficiency ratings** without first affording Dr. Hussain "a reasonable opportunity of at least thirty (30) calendar days to resolve the identified performance-related problem(s)" as required by Article 26(6) of the Labor Agreement.

Whether either of these two September 11, 2003 grievance topics are precluded by §7121(d) depends on whether they were raised by (1) Dr. Hussain's EEO complaints filed prior to his first grievance, or (2) his EEO complaints lodged thereafter and between the filings of his first and second grievance.

The 07/28/03 date Dr. Hussain was given his annual proficiency report, without either a union representative present or a 30 day correction opportunity, precludes those topics from having been raised by his 02/14/01, 04/19/02 or 07/22/02 EEO complaints, or his 02/04/03 Amended Title VII Complaint in District Court, since the two alleged Labor Agreement violations had not yet occurred at the time of any of these filings.

However, following Dr. Hussain's 07/28/03 receipt of his proficiency report, and

---

§7511. Consequently, since the Board had jurisdiction only over appeals from §7511 "employees," it dismissed Dr. Hussain's appeal for lack of Board jurisdiction.

during the interval between his first and second grievance, Dr. Hussain filed a single EEO complaint on September 5, 2003. This complaint raised the following additional topics, with what he indicated was the date of each event's occurrence:

| | | |
|---|---|---|
| **a.** | Termination threats | 08/2002 |
| **b.** | Denial of leave | |
| **c.** | Poor Performance Rating. | 07/28/03 |
| **d** | Constructive Discharge (retirement) | 08/14/03 |
| **e** | Denial of OWCP claim | 07/28/03 |
| **f** | AWOL Placement [Charge?] | 08/07/03 |
| **g** | Delaying Retirement Paper Processing | 08/15/93 |

Under the <u>Facha</u> approach, I find that Dr. Hussain's September 5, 2003 EEO complaint of a "Poor Performance Rating" on "07/28/03" necessarily precludes the arbitration of his later filed September 11, 2003 grievance over whether Labor Agreement Article 46(3) and 26(6) violations occurred. Again, the legal theory employed to characterize an incident as an EEO violation, or simply a violation of the parties' labor agreement, does not determine what constitutes a "matter." Rather, that is determined by whether the allegation in the second filing is talking about the same factual subject or incident. As the <u>Facha</u> court would have explained, "If [Dr. Hussain] raised a topic in both documents, <u>or if the [EEOC and court] would necessarily have need to inquire into a topic in discharging their duties, then §7121(d) bars [him] from raising that same topic in [his] subsequent [grievance]</u>" (emphasis added).

Here, I cannot find a way to untangle or free the grievance's alleged denials of union representation and a 30 day period to correct performance deficiencies from the EEO complaint against the receipt of a "Poor Performance Rating." Both in the regulatory processing of that complaint and in the judicial consideration of his Title VII suit, there would necessarily be a need to inquire into the two topics of the subsequently filed grievance. Key elements of his proof of prohibited discrimination would have to be that whites, non-Indians, non-Muslins, and/or females, were not denied their right to a union presence or to a 30 day correction opportunities before receiving a job performance rating similar to his. It's unimaginable that an individual Title VII claim could prevail without proof of such disparate treatment.

The Union's insistence that the matter of the "Poor Performance Rating" was

FMCS Case No. 03-01444
AFGE L.2798 & VA

being pursued in the EEO complaint and Title VII suit as an element of "Reprisal, Harassment and Age," cannot serve to change my determination. In addition to the rule I am following against a §7121(d) finding being based on legal jargon, it remains unimaginable that the two grievance sub-topics of a lack of union representation and a 30 day period to make amends, could be separated out from any of the reasons advanced in Dr. Hussain's Title VII suit as the real basis for his "low satisfactory" proficiency rating.

A second Union argument draws, and expands, on the "inseparability" idea. It maintains that because Dr. Hussain's September 11, 2003 "performance rating" grievance is "like and related" to his July 9, 2003 "clinical privileges" grievance, his intervening September 5, 2003 EEO "low performance" complaint can be ignored because §7121(d) rendered his September 5, 2003 EEO complaint a nullity.

Stated another way, the initial negative assessment of Dr. Hussain's professional competence came when his clinical privileges were renewed, subject to modifications. Because that "matter" was first raised in his July 9, 2003 grievance, the Union argument is that §7121(d) bars not only that specific "matter" from being raised in a later filed EEO complaint, but it also bars any subsequent assessments of Dr. Hussain's professional competency from being the subject of EEO complaints. Stated yet another way, because the later assessment would be "like and related" to the earlier professional competency matter already confined by §7121(d) to the grievance procedure, the second assessment must also be confine to the same procedure. Any attempt to shift the second or any latter contest over an assessment of Dr. Hussain's professional competence into the EEO complaint processing procedure is simply a nullity according to the Union's logic.

The phrase, "like and related" comes up in two contexts bearing on jurisdiction, neither of which is particularly helpful to the Union. The first involves FLRA jurisdiction under 5 USC §7122(a) to review exceptions taken to arbitration awards, as long as they do not "relate" to a matter described in [§]7121(f). Among matters listed in §7121(f) are 5 USC §4303 removals for unacceptable job performance, and §7512 major, misconduct based, adverse actions running from suspensions for more than 14 days up to and including removals.

To understand what the Authority has consider as a §7122(a) jurisdiction prohibiting relationship between two matters, examples are instructive. In US Air Force Hill AFB and AFGE Local 1592, 58 FLRA 117 (2003), the grievant had been sent home as unfit for duty because of intoxication and told not to return until he underwent two rehabilitation programs. A grievance was filed over the Agency's imposed condition for return. Subsequently, the grievance was suspended indefinitely for failure to timely comply with the condition. At arbitration, the issue was, "Did management violate a negotiated policy . . . by placing [the grievant] on permanent 'not fit for duty status?'"

The arbitrator found that the agency had wrongly required the grievant to undergo rehabilitation and ordered his reinstatement with back pay. The Agency filed exceptions to the award with the FLRA.

The Authority found it lacked §7122(a) jurisdiction. The fact that the grievance had not mentioned a then yet to be imposed "14 days or more suspension" made no difference since the FLRA "looks at the claim advanced in arbitration, not the grievance [as filed], when determining its jurisdiction."[13] "Put simply, . . . the Agency's refusal to permit the grievant to return to work is part and parcel of the subsequent notice of indefinite suspension." Likewise, AFGE Local 3627 and HHS, SSA, Hearings and Appeals, Region IV, 31 FLRA 837, 839 (1986), held that a short term suspension was "inseparable" from a subsequent §7512 removal for continued acts of insubordination.

Perhaps most like the "matters" the Union seeks to link together as "like and related" in the case before me was US Army Missile Command and AFGE Local 1858, 28 FLRA 11 (1987) where the Authority dismissed exceptions to an award pertaining to a performance appraisal because the performance appraisal "was the basis" for the grievant's subsequent §4303 removal for unacceptable job performance.

The other reference I find to a concept of "like and related" is its use by EEOC. There the phrase is "like or related," and it appears in the Commission's regulations promulgated to implement the application of Title VII, and other non-discriminatory statutes to federal employment. Specifically, 29 CFR §1614.106(d) provides:

> A complainant may amend a complaint at any time prior to the conclusion of the [agency] investigation to include issues or claims like or related to those raised in the complaint. After requesting a hearing , a complainant may file a motion with the administrative judge to amend a complaint to include issues or claims like or related to those raised in the complaint.

A problem faces the Union if it is relying on the FLRA's "like and related" reasoning to free Dr. Hussain's grievance's alleged denials of union representation and a 30 day period to correct performance deficiencies, from his earlier EEO complaint against the receipt of a "Poor Performance Rating." To begin with, time-wise, the Authority looks from the "matter" of the arbitration award over which it would otherwise have §7122(a) jurisdiction to determine whether the "matter" of a later personnel action was

---

[13] As can be discerned from what has already been said, the opposite is more often true when an arbitrator sets about determining his jurisdiction in accordance with §7121(d), since that provision directs attention to when and where a "matter" is first raised, which in most instances is either the first written step of the grievance procedure or the initial filing of an EEO complaint.

canceled out by §7121(f). The trouble is that if I accept that approach, the first link in the chain leading up to Dr. Hussain's 07/09/03 clinical privilege grievance, then to his 09/11/03 "low satisfactory" proficiency rating grievance, and finally to his "constructive discharge" claim raised on 11/12/03, on the eve of arbitration, may be his 02/14/01 EEO complaint (Arb.Ex. 1). That complaint included the claim that he had been made the subject of a National Practitioner Data Bank Peer Review Panel as an act of reprisal for filing an unidentified EEO complaint.

The outcome of that peer review is unknown as far as the record compiled to date in this arbitration is concerned.
          In

The most recent attorney representing Dr. Hussain in his Title VII suit appears to recognize this. In Dr. Hussain's Second Amended Complaint, filed November 6, 2003, it is alleged in parts of paragraph 18(f) that:

> Poor Performance Evaluations. Dr. Hussain enjoyed outstanding perfor-mance evaluations for 19 years. He did not, however, receive any evalua-tions from 1997 through 2001, while Acting Chief. Presumably, he was performing satisfactorily for him to remain in that position for such a long period of time. After Dr. Barth's hire, which Dr. Hussain vigorously op-posed, and Dr. Hussain's filing of an EEOC claim, Dr. Hussain received his first negative evaluation[. It was] from Dr. Barth. . .

> On July 28, 2003, Dr. Barth and Dr. Manning, without any prior verbal or written notice, met with Dr. Hussain and gave him a negative perfor-mance evaluation. This negative performance evaluation was biased and flawed in several respects, and was clearly a reprisal for Dr. Hussain's filing an EEO claim.

> As an example of how Dr. Hussain received disparate treatment, Dr. Barth went outside known procedures in rendering his false evaluation. Dr. Barth is aware that Dr. Hussain is entitled to union representation if given a poor appraisal. Notwithstanding this fact, Dr. Barth never contacted a union representative to inform Dr. Hussain of any deficiencies prior to meeting with Dr. Hussain. Further, Dr. Barth met with Dr. Hussain despite Dr. Hussain's telling Dr. Barth that he would prefer not to have a meeting in which a negative performance appraisal is discussed or given to him without the union representative present. . .

These Second Amended Complaint allegations, made after both the September 5 EEO complaint and the September 11, 2003 grievance were filed, are quoted to flesh-out what Dr. Hussain meant by the cryptic reference in his EEO complaint to "Poor Performance Rating." They have no direct relevance to the apparent §7121(d) block to my jurisdiction over Dr. Hussain's second grievance.

However, they point up a problem. Bargaining unit employees often do not understand the practical effects of a §7121(d) election to pursue a complaint through the EEO process rather than through the negotiated grievance procedure and arbitration.[14]

As a result, there is often an imbalance in the information readily available about the advantages and disadvantages of the grievance process over the EEO process, and vice versa. Most important, where the EEO office is the primary source of information, a bargaining unit employee may not learn of the practical effects of an election to file a written EEO complaint rather than a grievance. He or she will be given a written notice about the legal consequence of electing to file an EEO complaint, but not about the heavier burden of proof and other consequences of that election.

Since the parties were not asked, there is nothing of record about the information and advice given to bargaining unit employees who come to either a local union officer or the EEO office with a personnel problem or complaint. Still, there is enough in the chronology and content of Dr. Hussain's various EEO complaints and Labor Agreement grievances to suggest that he did not appreciate either the legal or practical ramifications of §7121(d). His second grievance is especially telling of the practical quandaries he has created for himself by his earlier EEO complaint.[15] Those quandaries are the flip

---

[14] Title VII as amended gives bargaining unit employees a second avenue to follow with a complaint or a concern. In addition to the local union, they have the agency's EEO office. For bargaining unit employees who are not union members, the first office visited is often the agency's EEO office. That office, as a beneficiary of the mandatory postings of "EEO rights" which appear throughout an agency, frequently including the agency's restrooms, is well known to employees. In many agencies, it will have a full time staff. On the other hand, rarely if ever are notices kept posted of "grievance rights," inviting bargaining unit employees to contact a union officer to explore filing a grievance.

[15] It is accepted that, pursuit to the EEOC implementing regulations, at or before Dr. Hussain filed his 09/05/03 written EEO complaint, he was informed in writing that he had an option between the grievance procedure and the EEO process, and that by choosing one over the other, he was making an "irrevokable election" between the two. Whether he understood, or was actually given the information, is of no consequence since §7121(d) requires neither.

side of the benefit of his first grievance having been filed before any duplicate EEO complaint.

Assuming the validity of Dr. Hussain's 09/11/03 grievance that his rights under Articles 46(3) and 26(6) of the Labor Agreement were violated, by implicating those two "topics" in his prior EEO complaint, which only tersely complained that his "Poor Performance Rating" was given as "Reprisal & Harassment" for his 01/14/01 EEO complaint (arb.Ex. 1), if not other of his filings before his 9/11/03 grievance, Dr. Hussain effectively removed those two topics from the grievance/arbitration procedure.

Had they been lodged in the procedures leading to arbitration, his basic elements of proof would have been that (1) his "low satisfactory rating" was subject to Labor Agreement Articles 46(3) and 26(6) protections, and (2) he was denied those protections. Had he proved that, the remaining issue would been relief, which at least would have been to start the evaluation rating procedure all over. As is, should his Title VII action reach a jury determination stage, he will have to satisfy the burden of demonstrating that his "low satisfactory" rating was the result of retaliation by Drs. Barth and Manning for his prior EEO complaint, or because of their intent to discriminate against him on the basis of his race, color, sex, religion, or national origin.

**The Impact of §7121(d) on Dr. Hussain's Step 1 Written (AWOL) Grievance filed on September 15, 2003.** In essence, Dr. Hussain's third grievance alleged that:

> In violation of Article 32 -Time and Leave, Section 5 - Documentation for Sick Leave, Dr. Hussain was wrongly placed in AWOL status after his physician had faxed a letter to Management stating the nature of medical reasons why Dr. Hussain needed to be placed on sick leave, and the expected length of his absence.

As chronicled above, Dr. Hussain's EEO complaint filed on September 5, 2003 listed as acts of reprisal, harassment and age both the "Denial of Leave" and his "AWOL Placement." Details of what both the EEO complaint and Dr. Hussain's third grievance involved are provided in his Second Amended Complaint in his Title VII suit (Arb.Ex. 6). The AWOL was included as an incident of alleged prohibited discrimination based on his race, sex, religion and national origin, as well as in retaliation for Dr. Hussain's filing of previous EEO complaints. The allegation stated:

> g. **Denial of Medical Leave.** Dr. Hussain, as of July 28, 2003, was placed on Medical Leave by his treating physician and his treating psychiatrist for conditions that he ha[d] previously received treatment. Both doctors placed Dr. Hussain on medical leave after making thorough

professional appraisal[s] of Dr. Hussain's condition.  The doctors followed all necessary protocols and completed the requisite documentation required for placing a VA employee on medical leave.  Dr. Hussain timely notified Dr. Barth and Dr. Manning and through his doctors of the leave.  Yet, Dr. Hussain was notified via US Mail, in a letter written by Dr. Manning, that his medical leave was not approved.  Dr. Barth and Dr. Manning came to this determination : a) without a conversation with either of Dr. Hussain's treating physicians regarding Dr. Hussain's medical status; b) without requesting clarification by either of the physicians regarding Dr. Hussain's medical status; or c) by requesting another evaluation of Dr. Hussain's condition.  This subjective and biased process in which Dr. Barth and Dr. Manning personally came to a conclusion on Dr. Hussain's medical status is not the way medical leave is granted or denied.  No other staff member or physician would have been treated in this manner.  Dr. Hussain is treated differently as a result of his filing EEO claims against his superiors.  Dr. Hussain, who has a child that is a student at UCLAs and another at Georgetown, was placed on leave without pay status from August 12, 2003.

Thus, besides Dr. Hussain clearly complaining in his written and signed September 5, 2003 EEO complaint (Arb.Ex. 6) about the "denial of leave" and "AWOL placement," his later filed November 11, 2003 Second Amended Complaint (Arb.Ex. 9) further clarifies that those "topics" are one and the same as contained in his September 15, 2003 Step 1 Grievance (Arb.Ex. 8).

Despite these facts, the Union argues that I should not conclude that the topics of the denial of Medical Leave and the resulting AWOL are barred from this arbitration by 5 USC §7121(d). In its view, I should not be bound by the documented fact that those items were listed in Dr. Hussain's September 5, 2003 EEO complaint,filed 10 days in advance of his September 15, 2003 Step 1 Grievance seeking to raise those same topics in the negotiated grievance procedure.

As best can be made from the Union's arguments, one suggests that the Agency should be held to have waived any objection based on §7121(d) to my jurisdiction.  The Union's position is that when the Agency's Office of Resolution Management rejected Dr. Hussain's September 5, 2003 EEO complaint on the basis that claims therein were previously raised in "a union grievance . . ." (Arb.Ex. 28), the Agency cannot now claim otherwise.[16]

---

[16] The Union did not use the word "waiver" in its argument.  However, in effect, its reliance on the March 8, 2004 letter from the VA's Office of Resolution Management as an accurate assessment of the sequence of EEO complaints and grievance filings, and the "matters" raised in each, is either a claim

The problem with the Union's "waiver" line of reasoning is that the Agency is powerless to waive what Congress has dictated as the conditions under which the nation's sovereign immunity is waived. There must be strict compliance with the procedural steps Congress has prescribed, and any misstep which deprives me of jurisdiction cannot be forgiven by the Agency. Likewise, I am powerless to ignore the Agency's impotency. As I tried to explain and emphasize in my May 27, 2004 letter to he parties:

> My jurisdiction exists only if (1) the sovereign immunity of the United States has been waived, and, (2) "the limitations and conditions upon which the Government consented to be sued [whether in the courts or before an arbitrator, have been] strictly observed." Lehman v. Nakshian, 453 US 156, 161 (1981). It is this latter requirement of strict observance of procedural requirements that I am worried about, and cannot ignore.

In addition, and as will be explained further in the discussion of Labor Agreement timeliness, the VA's Office of Dispute Management simply got the facts wrong. As already stated, I find the parties' submissions to me establish that the two "matters" of medical leave, and certainly that of Dr. Hussain's being placed on AWOL, were first raised in Dr. Hussain's September 5, 2003 EEO complaint. Any mistaken recitation of the facts by the Office to the effect that those matters were first raised in the EEO complaint filed by Dr. Hussain on November 7, 2003 cannot sidetrack my responsibility to determine my jurisdiction.

**The Effect of §7121(d) on the Union Claim that Dr. Hussain was "Constructive Discharge by the VA."** Neither party has considered whether §7121(d) bars the arbitration of the alleged constructive discharge of Dr. Hussain. The Agency's arguments against arbitral jurisdiction are based solely on the Labor Agreement.[17] However, whether the Labor Agreement allows the injection of a claim of constructive discharge during the process of selecting an FMCS arbitrator, is a dispute which will not be reached in this arbitration. Simply put, an explicit federal statute always overrules any conceivable interpretation of a labor agreement. Again, §7121(d) mandates that with the first forum in which a topic was raised, the die was irrevocably cast.

---

of an Agency waiver or an insistence that I am bound by the letter's determinations and cannot go behind them. Both propositions lack merit.

[17] The Union has not forcefully challenged these arguments, but perhaps relies on simply look ing back on Dr. Hussain's retirement and concluding resignation was forced on Dr. Hussain by Drs. Barth's and Manning's, and Director Garfunkel's alleged hostile, unjustified, and discriminatory treatment. This argument is better articulated in Dr. Hussain's Second Amended Complaint filed in District Court (Arb.Ex. 9) than it has been here.

Here, the topic of a constructively discharged was not first raised as a topic in the negotiated grievance/arbitration procedure. Its first mention in that procedure came in the parties' joint November 12, 2003 request to the FMCS for an arbitrator. On the other hand, Dr. Hussain's September 5, 2003 written EEO complaint specifically complained of a "constructive discharge." Furthermore, in his November 7, 2003 written EEO complaint, if not his Second Amended Complaint filed the day before in his Title VII suit in District Court, the elements of a constructive discharge were injected into the EEO process.

By raising the topic of a "constructive discharge" in the EEO process prior to raising it at any stage of the grievance/arbitration procedure until the final arbitrator selection stage, Dr. Hussain precluded its consideration before me. That's the effect of §7121(d).[18]

The Union does not see it this way. It argues that §7121(e) opens an end run around §7121(d) because a constructive discharge is equivalent

**Summary of §7121(d) and §7121(e)(1) Jurisdiction Issues**. Under 5 USC §7121(d) and §7121, arbitral jurisdiction exists over only the +following two "matters:"

1. Whether on **06/03/03**, Management violated Article 26(6) of the Labor Agreement when, without first "afford[ing Dr. Hussain] a reasonable opportunity of at least thirty (30) calendar days to resolve the identified performance-related problem(s)," it notified Dr. Hussain that his **clinical privileges** were renewed, but with "modifications" requiring Dr. Hussain to document "in the patient's record weekly examination results (symptoms and physical signs), related to the patient's treatment site and the patient's overall condition while on treatment and for follow-up visits." If so, what should the remedy be.

2. Whether Management violated Article 32(5) of the Labor Agreement when it denied Dr. Hussain's physicians' request that Dr. Hussain be placed on **medical leave**, and thereafter placed him in **AWOL** status without pay, effective **August 12, 2003**.

**Timeliness and Other Procedural Requirements of the Labor Agreement**

**Step 1 Timeliness of Dr. Hussain's July 9, 2003 (clinical privileges) and**

---

[18]   At most, should he prevail on his clinical privileges and AWOL grievances in this arbitration, he may be allowed by the District Court, depending on its reading of §7121(d), to ask that his success be consider as evidence of those two matters as elements leading to his resignation and retirement. On the other hand, should the Agency prevail, it arguably would have evidence that Dr. Hussain's failure on these elements taint the validity of his other claims of hostility and unfairness leading to his retirement.

**September 15, 2003 (AWOL) Grievances**. Ordinarily, this issue would be controlled by Article 27, Section 7 of the Labor Agreement, which on the question of <u>Grievance Procedures</u>, provides:

> <u>Step 1</u>.  An employee and/or Union shall present the grievance to the immediate or acting supervisor with an informational copy to the Director of the facility in writing within thirty (30) calendar days of the date that the employee or Union became aware or should have become aware of the act or occurrence or anytime if the act or occurrence is of a continuing nature.

Dr. Hussain's July 9, 2003 grievance, complaining of being denied a 30 day period to correct any deficiency in his clinical practices before "modifications" were placed on his clinical privileges, on its face, appears due to be rejected for lack of having been timely filed. Specifically, the grievance acknowledges that Dr. Hussain was notified on June 3, 2003 about the "modifications." Yet, the grievance is dated July 9, 2003, six days outside the 30 day period during which it should have filed.

Likewise, Dr. Hussain's September 15, 2003 grievance, complaining first of being denied medical leave, and thereafter, of being placed on AWOL for lack of an approved reason for his absence from duty, also appears to have been filed out of time. The written grievance provides no information as to the dates of either the denial of medical leave or when Dr. Hussain was placed in AWOL status. Only by looking to Dr. Hussain's Second Amended District Court Complaint, is it found that the date of August 12, 2003 is alleged as the starting date of his AWOL. If August 12, 2003 is the Article 27 trigger date, then the September 15, 2003 filing of the Step 1 (AWOL) grievance was three or more days too late.

No information has been provided about the subtleties or controlling boundaries of Article 27(7). Neither party has brought to my attention any past practices or binding interpretations of Article 27 which I would be obligated to follow. This is too bad. I would have liked to have gotten a better understanding of the "exceptions" to the 30 days rule otherwise prescribed by Article 27. Especially curious is whether the "modifications" to Dr. Hussain's clinical privileges, for so long as they remained in place, could be considered "of a continuing nature." Or, whether being treated as AWOL is a matter "of a continuing nature."

Also, not discussed is precisely when Dr. Hussain learned of his AWOL. If it came with the failure to receive a pay check for the pay period which included August 12, 2003, that might have been two weeks or more after that date since, in most federal agency, there is one 14 day pay period lag between the end of a pay period and payment for that period.

With respect to both grievances, another unanswered, but intriguing question is the effect I should give to Section 4 of Article 27, which provides:

> If either party considers a grievance non-grievable or non-arbitrable, the original grievance will be considered amended to include this issue. The Department must assert any claim of non-grievability or non-arbitrability no later than the Step 3 decision.

As luck would have it, there is no need to be assured that anything lurks in Article 27 beyond the plain meaning of the language of Section 7; a Step 1 grievance must be filed "within thirty (30) calendar days of the date that the employee or Union became aware or should have become aware of the act or occurrence. . ." Any Agency objections to the Step 1 timeliness of Dr. Hussain's two currently surviving issues were waived by the Agency's March 8, 2004 letter to Dr. Hussain's then current attorney from the VA Office of Resolution Management.

That letter dismissed two of Dr. Hussain's EEO complaints on the basis that they concerned the same "matters" as previously raised in <u>timely filed</u> grievances. Specifically, the letter stated in relevant part:

> The purpose of this letter is to advise you of the consolidated, partial acceptance of the EEO complaints of discrimination of [Dr.] Hussain, Case No. 2004-0688-2003193816, filed September 5, 2003 and Case No. 2004-0688-2004100109, filed November 7, 2003, against officials of the VA Medical Center, Washington, DC. The dates of the complainant's initial contact with an EEO counselor are July 28, 2003 and October 8, 2003.
>
> [area of redacted materials]
>
> We have reviewed the evidence of record and we have determined that the complainant filed a union grievance on August 18, 2003, relating to unacceptable performances,[19] and one on September 15, 2003

---

[19] The only action taken on August 18, 2003 which can be accounted for in the chronology provided above was item **7** listed above, the **08//18/03 Agency Rejection of the 07/22/03 Step 2 Written (clinical privileges) Grievance** (Arb.Ex. 5A), where the asserted basis for the rejection were:

**1.** As a Title 38 Physician, Dr. Hussain is not covered by Art. 26(6), <u>Performance Appraisal System Process</u>, and,

**2.** Under Labor Agreement Art. 42(2)(C), <u>Grievance Procedure</u>, and 38 USC §7422, excluded

in regard to being charged [with an] absence without leave from, on or about, July 29, 2003. The records show that the complainant filed a formal EEO complaint on September 5, 2003 (to include events of unacceptable performance and leave) and on November 7, 2003 (to include leave concerns that he previously addressed in his September 15, 2003 complaint). Based on the evidence of record, we have determined that the complainant elected to pursue these events through the negotiated grievance procedure. Therefore, the events of leave and unacceptable performance are **DISMISSED** in accordance with 29 CFR 1614.107(a)(4) [the EEOC regulation implementing 5 USC §7121(d)] as matters raised under a negotiated grievance procedure that permits allegations of discrimination [bold type in original].

It appears from this correspondence that the Agency dismissed two of Dr. Hussain's EEO complaints on the basis of 5 USC §7121(d), with the assertion that the "matters" covered had previously been raised by the grievances in issue in this arbitration. However, determining which EEO complaints and which grievances are being referred to require some thinking. The two Case Numbers provided are of no help since what the parties have submitted into the arbitration record are copies of Dr. Hussain's initial EEO complaint forms, filled out and dated in his handwriting, which at that point had not received Agency Case Numbers. However, the EEO complaint filing dates recited in the letter can be matched.

"Case No. 2004-0688-2003193816, filed September 5, 2003," makes it the same as Item 10 in the chronology, Dr. Hussain's **09/05/03 Written EEO Complaint** (Arb. Ex. 6), listing "Reprisal & Harassment & Age," as the basis for the acts of:

---

from the grievance procedure are matters or questions concerning (a) professional conduct or competence involving direct patient care or clinical competence, and/or (b) peer review.

Assuming this is the grievance being referred to in the letter, its actual filing date, according to the evidence of record as reflected by the chronology complied above, was item **4**, the **07/09/03 Step 1 Written (clinical privileges) Grievance** (Arb.Ex. 4), alleging that:

**a.** On **06/03/03**, Dr. Hussain was notified that his **clinical privileges** were renewed, but with "modifications" requiring Dr. Hussain to document "in the patient's record weekly examination results (symptoms and physical signs), related to the patient's treatment site and the patient's overall condition while on treatment and for follow-up visits."

**b.** In taking this action, the Agency violated the parties' Labor Agreement in that Dr. Hussain was not "afforded a reasonable opportunity of at least thirty (30) calendar days to resolve the identified performance-related problem(s)," as required by Article 26(6).

**a.** Termination threats          Date of Occurrence          08/2002

**b.** Denial of leave                                          07/28/03

**c.** Poor Performance Rating.

**d.** Constructive Discharge (retirement)                      08/14/03

**e** Denial of OWCP claim                                      07/28/03

**f** AWOL [Pay status] Placement                              08/07/03

**g.** Delaying Retirement Paper Processing                     08/15/93

Case No. 2004-0688-2004100109, identified in the letter as filed on November 7, 2003, is accepted as referring to Item 15 in the chronology, Dr. Hussain's **11/07/03 EEO Written Complaint** alleging reprisals for prior EEO complaints or activity in the form of the following taking place, or beginning, on the individual dates indicated:

**a** Refuse to grant sick leave, AWOL, no pay check since 8/03     08/03

**b.** Delay in processing early/disability retirement.             07/17/03

**c** Denial of/failure to provide counsel                         09/17/03

**d** Denial of access to Official Personnel File                  09/17/03

**e** Offering waiver for early retirement, bu without back pay.    09/17/03

**f.** Complaint to Professional Standards Board                    09/17/03

More complicated are the identities of the two grievances which the correspondence claims preempted portions of the two EEO complaints. There was no grievance at any step filed on August 18, 2003. Rather, according to the chronology and the parties' submissions in this arbitration, what matches that date is Item 7, the **08/18/03 Agency Rejection of Dr. Hussain's 07/22/03 Step 2 (clinical privileges) Grievance** (Arb.Ex. 5A). Without questioning the original timeliness of the Step 1 filing, the Agency asserted in that rejection that:

**a.** As a Title 38 Physician, Dr. Hussain is not covered by Art. 26(6), Performance Appraisal System Process, but by Art. 54, Proficiency.

**b.** Furthermore, under Labor Agreement Art. 42(2)(C) <u>Grievance Procedure</u>, and 38 USC §7422, excluded from the negotiated grievance procedure are matters or questions concerning (a) professional conduct or competence involving direct patient care or clinical competence, and/or (b) peer review.

From this recitation, it is clear that the Agency was again rejecting on August 18, 20003 Dr. Hussain's July 9, 2003 grievance over Management's failure to accorded him a 30 day correction opportunity before "modifications" were imposed on his clinical privileges. This Step 2 Rejection could not have been referring to his "low satisfactory" proficiency report which he was given on July 28, 2003 after being summons to a meeting with Drs. Barth and Manning for that purpose. That event occurred more than two weeks after the Step 1 filing of the grievance.

I also interpret the subject matter of Dr. Hussain's 09/05/03 EEO Complaint with which the VA Office of Resolution Management was dealing, as concerning the same subject. In other words, I find that the conclusion reached by the VA Office of Resolution Management was the same reached by me. Namely, the "matter" or "topic" of "clinical privileges" was first raised in Dr. Hussain's 07/09/03 Step 1 Grievance and not in an earlier EEO complaint.[20]

Now, for the significance of that conclusion and why it leads to the further conclusion that the VA has waived any objections to the Step 1 timeliness of the two grievances. While neither party to an arbitration, even with the collusion of the arbitrator, can waive what §7121(d) dictates, the same is not so with what the Labor Agreement dictates on grievance timeliness.

An employer is always free to waive a claim of grievance's untimeliness occurring at any step in the grievance procedure, and will frequently be found to have done so on the slimmest of its miscalculations or mis-actions. This arbitral readiness to find a procedural waiver follows as a corollary of the proposition that arbitration is a search for a fair and equitable resolution of the substantive issues in dispute, unencumbered by overly faithful compliance with traditional rules of evidence or other legalistic considerations, the avoidance of which will not infringe on either party's ability to present or defend their case.

With this in mind, I find that as a result of the VA Office of Resolution Management's conclusion about the §7121(d) effect of Dr. Hussain's July 9, 2003 (clinical privileges) grievance, the VA waived any Labor Agreement objection to its timeliness. It is

---

[20] Of course, it is of no consequence that the VA Office of Resolution Management's §7121(d) conclusion agrees with mine. If we are both wrong about my having §7121(d) jurisdiction over Dr. Hussain's clinical privileges grievance, we will not be deemed to have "waived" the statutory defect.

the wording of §7121(d) which compels this conclusion. Specifically, since §7121(d) requires that a grievance be "timely filed" in order to constitute an election of forums, then ipso facto, when the Agency asserted that Dr. Hussain's July 9, 2003 grievance blocked the meaningful filing of his 09/05/03 EEO complaint, it accepted the timeliness of the grievance and waived any claims to the contrary.

So too has the VA waived any timeliness objection to the September 15, 2003 Step 1 filing of Dr. Hussain's AWOL grievance. The identification in the VA Office of Resolution Management's March 8, 2004 letter of a September 15, 2003 grievance as serving to preclude Dr. Hussain from later filing an EEO complaint over being charged with AWOL, matches up perfectly with Item 11 in the chronology, namely, Dr. Hussain's 09/15/03 Step 1 AWOL Grievance.

In summary, the Agency cannot have it both ways. It cannot block the consideration of a complaint in the EEO process on the basis that it is statutorily forbidden because of the earlier "timely filing" of a grievance over the same matter, and then turn around, and in arbitration claim the grievance was "not timely filed" under the Labor Agreement. While, the Agency cannot ignore a statutory requirement, nothing forbids it from waiving a Labor Agreement requirement. For these reasons, no Article 27 barrier remains standing to the arbitration of either Dr. Hussain's clinical privileges grievance or his AWOL grievance.

**Other Claimed Irregularities in Processing Dr. Hussain's July 9, 2003 (clinical privileges) and September 15, 2003 (AWOL) Grievances**. Besides claiming a lack of Step 1 timeliness, the Agency also alleges that Dr. Hussain's July 9, 2993 (clinical privileges) grievance was taken by the Union only to and through Step 2, and that the AWOL grievance initiated on September 11, 2003, was taken no further than Step 1. The Agency argues that this lack of follow-through by the Union invalidates its invocations of arbitration.

However, with respect to Dr. Hussain's clinical privilege grievance, the record does not support the Agency's claim. Arbitrator's Exhibit 5B, submitted by the Union, is a Step 3 grievance signed by Richard E. Settle, the Union's Secretary-Treasurer/Shop Steward, with the apparent signature of Patricia Cooper (sp?) showing its receipt by the Agency on August 22, 2003. This placed the ball in the Agency's court, and its failure to respond was tantamount to a Step 3 rejection, opening the way to arbitration.

As for the AWOL grievance, I reject the Agency's argument that the grievance was abandoned by the Union. There is a reason why the Agency was unable to produce a written Step 2 grievance. Arbitrator's Exhibit 24A, submitted by the Union, shows that on October 17, 2003, the Union attempted to file a Step 2 AWOL grievance signed by Richard Settle on which he made the handwritten notation that, "Manage-

lishment, determination, or adjustment of employee compensation under this Title [38].

Note 1:  Any question concerning the extent of the exclusions in Paragraphs C1-C3 will be resolved in accordance with the VA Partnership Council's *Guide To Collective Bargaining and Joint Resolution of 38 USC Section 7422 Issues*, which provides that these exclusions will be applied narrowly and only to matters clearly and unequivocally involving direct hands-on patient care or clinical competence.

Note 2:  The language in Paragraph C in this Section shall only serve to preclude a grievance where the Secretary, or a lawfully appointed designee of the Secretary (currently the Under-Secretary for Health), determines in accordance with 38 USC [§]7422 that the grievance concerns or arises out of one or more of the three (3) items listed above.  Any determination under this language by the Secretary or the Secretary's designee is subject only to judicial review pursuant to 38 USC [§]7422(c).

As I noted in my December 16, 2004 Preliminary Decision on Arbitral Jurisdiction Management had raised 38 USC §7422(b) as a bar to Dr. Hussain's clinical privileges and profciency grievances at various of the lower steps of the grievance procedure and before me but without the determination of the Under Secretary for Health which Note 2 to Article 42, Section 2 of the VA/ AFGE Labor Agreement requires to effectively remove those grievances from the grievance/arbitration procedure.  Also raised as an issue for the parties to address was the effect to be given **Section 4 - Jurisdiction** of the Labor agreement which provides:

> If either party considers a grievance non-grievable or non-arbitrable, the original grievance will be considered amended to include this issue.  The Department must assert any claim of non-grievability or non-arbitrability no later the Step 3 decision.

However on the basis of a carefully reasoned decision issued on January 6, 2005, the VA's Acting Under Secretary for Health, Jonatan B. Perlin, MD, declared that Dr. Hussain's clinical privileges and proficiency grievances  raised issues "concerning or arrising out of professional conduct or competency" and as a result are non-grievable under 38 USC §7422(b), but that his sick leave/ AWOL grievance did not fall within the §7422(b) prohibition.  Still he went on to hold in response to a concern raised by DCMC Management that, "a related allegation of a constructive discharge may not be asserted through the negotiated grievance procedure as an alternative basis for the arbitrator to award remedies requested in the proficiency or clinical privileges grievances."

Even if I were not bound by the declaration in Note 2 to Section C of Article 42 0f the Labor Agreement that, "Any determination under this language by the Secretary or the Secretary's designee is subject only to judicial review pursuant to 38 USC [§]7422 (c)," I find it self evident from the text of the actions challenged in the clinical privileges and comptency grievances that what is involved in each were "matters clearly and unequivocally involving [ DR. Hussain's] direct hands-on patient care or clinical compe- tence," which Congress never for a moment intended to be subject to an arbitrator's determination.

Since §7422(b) is a jurisdictional statute   and because in the scheme of things Title 38 trumps any inconsistent provision in a labor agreement negotiated under Title 5, Management could not waive the prohibition on my jurisdiction contained in §7422(b) as Article 4 of the Master Agremnt quoted above could be read to do as a consequence of Management's otherwise inexcusable delay in procuring Dr.  Perlin's determination.

## AWARD

The only grievances or claims for which I retain arbitral jurisdiction under 5 USC §7131 (d) and §7131(e)(1) and 38 USC §7422(b) are:

1. Whether Management violated Article 32(5) of the Labor Agreement when it denied Dr. Hussain's physicians' request that Dr. Hussain be placed on **medical leave**, and thereafter placed him in **AWOL** status without pay, effective **August 12, 2003?**

2  To the extent that the **Constructive Discharge Claim** belatedly raised by the Union is based solely on the proposition that Dr. Hussain's retirement was forced upon him by Management's wrongful placing him on **AWOL** status without pay.  No evi- dence will be received going to either Dr. Hussain's **clinical privilege** grievance or his **proficiency  rating** grievance since as already discussed those subjects have been placed out of bounds by Dr. Perlin's 36 USC §7422 (b) determinations.  That is, no end runs will be allowed around Dr.Perlin's January6, 2006 determinations as to those two grievances and my lack of jurisdiction to consider them or grant relief on those matters directly or indirectly.

3. Because the present Award is inconsistent with my December 16, 2004 Preliminary Decision on Arbitral Jurisdiction wherein I indicated that I was inclined to find that I had jurisdiction to proceed to arbitratate and decide Dr. Hussain's **clinical privilege** grievance. While 5 USC §7121 and the issue of timeliness presented no barriers, Dr. Perlin's invocation of 38 USC §7422 constitute s an absolute block.  Accordingly my Preliminary Decision is hereby **overruled** and **declared to be void and of no force or effect for any purpose**.

- 53 -

FMCS Case No. 03-01444
<u>AFGE L.2798 & VA</u>

**So held** this <u>27th</u> Day of March, 2006

Robert T. Moore
Arbitrator